ANDRUS, SECRETARY OF THE INTERIOR, ET AL. *v.*
GLOVER CONSTRUCTION CO.

No. 79–48.   Argued March 24, 1980—Decided May 27, 1980

STEWART, J., delivered the opinion for a unanimous Court.

*Andrew J. Levander* argued the cause *pro hac vice* for petitioners.   With him on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Robert L. Klarquist,* and *Larry A. Boggs.*

*D. D. Hayes* argued the cause and filed a brief for respondent.*

---

*\*Reid Peyton Chambers, Arthur Lazarus, Jr.,* and *Richard A. Baenen* filed a brief for the Association on American Indian Affairs, Inc., et al. as *amici curiae* urging reversal.

MR. JUSTICE STEWART delivered the opinion of the Court.

The Buy Indian Act, 35 Stat. 71, as amended, 25 U. S. C. § 47, directs the Secretary of the Interior to employ Indian labor "[s]o far as may be practicable," and permits him to purchase "the products of Indian industry . . . in open market."[1] The question presented in this case is whether the Bureau of Indian Affairs (BIA) of the Department of the Interior[2] may, on the authority of this legislation, enter into road construction contracts with Indian-owned companies without first advertising for bids pursuant to Title III of the Federal Property and Administrative Services Act of 1949 (FPASA), 63 Stat. 393, as amended, 41 U. S. C. §§ 251–260.

## I

In 1976, the BIA formally adopted the procurement policy that "all [BIA] purchases or contracts be made or entered into with qualified Indian contractors to the maximum practicable extent."[3] To effectuate this objective, the BIA announced that in every procurement situation it would consider dealing with non-Indian contractors only after it had determined that there were "no qualified Indian contractors within the normal competitive area that can fill or are interested in filling the procurement requirement."[4]

---

[1] Title 25 U. S. C. § 47 provides in full:

"So far as may be practicable Indian labor shall be employed, and purchases of the products of Indian industry may be made in open market in the discretion of the Secretary of the Interior."

[2] The Secretary of the Interior has delegated his responsibilities and powers under the Act to the Commissioner of the BIA.

[3] 20 BIAM Bull. 1 (Mar. 3, 1976). See also 25 CFR § 162.5a (1978); 41 CFR § 14H–3.215–70 (1977). The Bulletin defined "Indian contractor" as a legal entity that is 100% Indian owned and controlled. An "Indian" was defined as a member of an Indian tribe or as a person otherwise considered to be an Indian by the tribe with which affiliation is claimed.

[4] The Bulletin admonished that, in all events, the contract price must be "fair and reasonable."

In early 1977, the BIA invited three Indian-owned construction companies to submit bids for the repair and improvement of a 5-mile segment of road in Pushmataha County, Okla. The road, commonly called the Honobia Road, is located within an area subject to BIA jurisdiction. The respondent, a non-Indian corporation engaged as a general contractor in roadbuilding and other forms of heavy construction, was not afforded an opportunity to bid.[5] On May 25, 1977, BIA awarded the contract to Indian Nations Construction Co., a corporation owned and controlled exclusively by Indians and the only Indian-owned company to have bid on the project. The final negotiated contract price amounted to approximately $1.2 million.[6]

The respondent then filed the present suit in the United States District Court for the Eastern District of Oklahoma, naming as defendants the Secretary of the Interior, the Department of the Interior, BIA, and the BIA contracting officer on the Honobia Road project (petitioners here). The respondent alleged that the petitioners were required by § 3709 of the Revised Statutes, 41 U. S. C. § 5, and Title III of the FPASA to advertise publicly for bids on the Honobia Road project. The respondent further claimed that the actions of the petitioners had denied it due process and equal protection in contravention of the Fifth Amendment of the United States Constitution. As relief, the respondent re-

---

[5] At the time, the respondent was on the list of available contractors maintained by the BIA. Previously, the respondent had competitively bid on and been awarded the contract covering another five miles of the Honobia Road.

In procurement parlance, contracts for which bids are publicly invited in advance are said to be let pursuant to "advertising." See 41 U. S. C. § 253; 41 CFR §§ 1–2.101, 1–2.203–1, 1–2.203–2 (1979). All other contracts are "negotiated." See 41 U. S. C. §§ 252 (c), 254; 41 CFR § 1–1.301–3 (1979).

[6] The BIA's area road engineer had earlier estimated that the job would cost $963,117.48.

quested the District Court to set aside the Honobia Road contract and to enjoin the petitioners from engaging in the unadvertised negotiation of contracts on the purported authority of the Buy Indian Act.

After the completion of discovery, the District Court granted summary judgment to the respondent. 451 F. Supp. 1102. The court concluded that the procedure followed by the petitioners in awarding the Honobia Road project to the Indian Nations Construction Co. violated the advertising requirements of the FPASA, in particular 41 U. S. C. §§ 252 (e) and 253. 451 F. Supp., at 1106. The court rejected the Secretary's contrary administrative construction as inconsistent with the plain language of the FPASA. *Id.,* at 1106–1108. Deciding in favor of the respondent on these statutory grounds, the District Court found it unnecessary to reach the respondent's alternative arguments under the Constitution. *Id.,* at 1108. The court thereupon declared the road construction contract that had been entered into between the petitioners and the Indian Nations Construction Co. to be null and void, and permanently enjoined the petitioners from circumventing the advertising requirements of 41 U. S. C. § 253 in connection with the remainder of the Honobia Road project and future road construction projects. 451 F. Supp., at 1112.[7]

A divided panel of the Court of Appeals for the Tenth Circuit affirmed the judgment. 591 F. 2d 554. Relying in large part on the analysis of the District Court, the Court of Appeals held that, whatever might arguably be the breadth of the Buy Indian Act standing alone, it had been pre-empted by the advertising requirements of the FPASA with respect

---

[7] The court denied the respondent's request that Indian Nations Construction Co. be made to refund the amounts it had been paid for work already performed on the Honobia Road project before the court's entry of judgment. 451 F. Supp., at 1109, 1112. In this connection, the District Court noted that 9.7% of the construction contract had been completed and paid for at the time of its decision. *Id.,* at 1109.

to the procurement of road construction projects. *Id.*, at 557–559. Alternatively, the Court of Appeals observed that it would "require a considerable 'stretch of the imagination' to conclude that the Congress intended the Buy-Indian Act to apply to road construction projects." *Id.*, at 560. The appellate court believed, in short, that the Act's preference for Indian "products" could not easily be read to include the performance of a roadway construction contract by an Indian-owned firm. *Id.*, at 562. In response to the petitioners' contention that the Buy Indian Act should be construed liberally to effectuate its remedial purpose, the court observed that "a primary, significant remedial feature of the advertisement and competitive bidding requirements of the [FPASA] is to obtain the best and lowest bid for the benefit of the American taxpayers in 'high cost' construction categories." *Ibid.* (emphasis deleted). We granted certiorari, 444 U. S. 962, to decide a question of importance in the proper exercise by the BIA of its procurement responsibilities.

## II

The Buy Indian Act was enacted in 1910 as part of legislation that subjected the purchase of Indian supplies by the Department of the Interior to the strictures of § 3709 of the Revised Statutes.[8] Section 3709, which had been in existence

---

[8] The Act of June 25, 1910, ch. 431, § 23, 36 Stat. 861, provided:

"That hereafter the purchase of Indian supplies shall be made in conformity with the requirements of section thirty-seven hundred and nine of the Revised Statutes of the United States: *Provided,* That so far as may be practicable Indian labor shall be employed, and purchases of the products of Indian industry may be made in open market in the discretion of the Secretary of the Interior. All Acts and parts of Acts in conflict with the provisions of this section are hereby repealed."

The origins of this legislation lay in a series of Appropriations Acts concerning the Indian Department of the Department of the Interior. Each of these annual Acts contained a provision whose language was similar to that of the present Buy Indian Act. See, *e. g.*, Act of Apr. 30, 1908, ch. 153, 35 Stat. 70; Act of Mar. 1, 1907, ch. 2285, 34 Stat. 1015.

since 1861,[9] required agencies subject to its provisions to advertise for bids on all but a few Government procurements.[10] The purpose of the Buy Indian Act was clear. Purchases by the Department of the Interior of "the products of Indian industry" were to be exempt from any requirement of advertising for bids imposed by § 3709 of the Revised Statutes.[11]

The legislation of which the Buy Indian Act was a part was amended from time to time between 1910 and 1965, but none of these changes affected the substance of what had been enacted in 1910. The BIA, as was true of most other departments of the Government, continued to operate under a general mandate that contracts for supplies and services be let in conformity with § 3709 of the Revised Statutes.[12] Sec-

---

[9] See Act of Mar. 2, 1861, ch. 84, § 10, 12 Stat. 220.

[10] In 1910, § 3709 of the Revised Statutes provided in pertinent part: "All purchases and contracts for supplies or services, in any of the Departments of the Government, except for personal services, shall be made by advertising a sufficient time previously for proposals respecting the same, when the public exigencies do not require the immediate delivery of the articles, or performance of the service. When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals."

[11] The structure of § 23 of the Act of June 25, 1910, evidences this intent. See n. 8, *supra.* So does the Act's legislative history. The House Report explained that "[w]ith the exceptions noted in the proviso," *i. e.,* the Buy Indian Act, § 23 "will bring the Indian Service, like all other branches of the public service, under the provisions of section 3709 of the Revised Statutes. . . ." H. R. Rep. No. 1135, 61st Cong., 2d Sess., 12 (1910). See also 45 Cong. Rec. 6097 (1910) (Rep. Burke).

[12] In 1926, § 23 of the 1910 Act was split into two parts for codification purposes. The language that required the BIA to adhere to the advertising rules contained in § 3709 of the Revised Statutes was placed in 25 U. S. C. § 93. The proviso respecting the purchase of Indian goods was located in 25 U. S. C. § 47. No contemporaneous suggestion was made that this separation was intended to affect the substance of either segment of the original Act.

In 1940, a further change occurred. As part of an effort to eliminate

tion 3709, in turn, was recodified (41 U. S. C. § 5) and amended, but its basic mandate remained the same.[13]   Government procurement was to proceed through advertising for bids unless excepted by § 3709 or "otherwise provided" by laws such as the Buy Indian Act.[14]

In 1965, the law affecting BIA procurement was substantially modified.   The regime of detailed contracting requirements contained in Title III of the FPASA, theretofore applicable only to the General Services Administration and to certain special procurements,[15] was extended to cover the purchasing procedures of the BIA and most other executive

---

redundant provisions respecting the operation of federal agencies, 25 U. S. C. § 93 was repealed and 41 U. S. C. § 6a (g) enacted in its place. See Act of Oct. 10, 1940, ch. 851, §§ 2 (g), 4 (a), 54 Stat. 1110, 1111, 1112. This rearrangement made "no changes in existing law." H. R. Rep. No. 2647, 76th Cong., 3d Sess., 1 (1940).   See S. Rep. No. 2135, 76th Cong., 3d Sess., 2 (1940).   Then, in 1951, 41 U. S. C. § 6a (g) was repealed. See Act of Oct. 31, 1951, ch. 654, § 1 (107), 65 Stat. 705.   Obsolescence seems to have led to the demise of 25 U. S. C. § 93 and 41 U. S. C. § 6a (g). See H. R. Rep. No. 1105, 82d Cong., 1st Sess., 2–3 (1951).   By 1951, § 3709 of the Revised Statutes had been amended to require advertising in all cases except where small purchases were involved, where a specific exemption in § 3709 applied, or where "otherwise provided in . . . other law."   See 41 U. S. C. § 5 (1946 ed.).

[13] In 1964, 41 U. S. C. § 5 (1964 ed.) read in pertinent part:

"Unless otherwise provided in the appropriation concerned or other law, purchases and contracts for supplies or services for the Government may be made or entered into only after advertising a sufficient time previously for proposals, except (1) when the amount involved in any one case does not exceed $2,500, (2) when the public exigencies require the immediate delivery of the articles or performance of the service, (3) when only one source of supply is available and the Government purchasing or contracting officer shall so certify, or (4) when the services are required to be performed by the contractor in person and are (A) of a technical and professional nature or (B) under Government supervision and paid for on a time basis."

[14] Since its codification in 1926 in 25 U. S. C. § 47, the Buy Indian Act has undergone no change in phraseology.

[15] See 41 U. S. C. § 252 (a) (1964 ed.).

agencies.[16] See 41 U. S. C. § 252 (a); 40 U. S. C. §§ 472 (a), 474. For covered agencies, one consequence of this legislation was to substitute the advertising requirements set out in Title III of the FPASA for those contained in § 3709 of the Revised Statutes. See 41 U. S. C. § 260; S. Rep. No. 274, 89th Cong., 1st Sess., 1, 5 (1965); H. R. Rep. No. 1166, 89th Cong., 1st Sess., 7, 9 (1965); 111 Cong. Rec. 27198 (1965) (Rep. Brooks).

Under Title III of the FPASA, the BIA must now adhere to the broad statutory mandate that "[a]ll purchases and contracts for property and services shall be made by advertising. . . ." 41 U. S. C. § 252 (c). From this directive, the statute specifically excepts only 15 types of procurements, the 15th covering situations where negotiated procurements are "otherwise authorized by law. . . ." § 252 (c)(15) (subsection (c)(15)).

The Buy Indian Act is clearly a "law" within the contemplation of subsection (c)(15). As § 41 U. S. C. 260 expressly states: "Any provision of law which authorizes an executive agency . . . to procure any property or services without advertising or without regard to [§ 3709 of the Revised Statutes, 41 U. S. C. § 5] shall be construed to authorize the procurement of such property or services pursuant to section 252 (c)(15) of this title without regard to the advertising requirements of . . . this title." See also S. Rep. No. 274, *supra,* at 5; H. R. Rep. No. 1166, *supra,* at 8. As noted above, the Buy Indian Act has from its inception authorized the BIA to "purchas[e] the products of Indian industry" without regard to the advertising requirements of § 3709 of the Revised Statutes.

Relying on subsection (c)(15) and § 260, the petitioners argue that the BIA proceeded correctly in awarding the Honobia Road contract to the Indian Nations Construction Co. without prior public advertising for bids. They assert that

---

[16] 79 Stat. 1303.

a road constructed or repaired by an Indian-owned corporation is a "product of Indian industry" within the meaning of the Buy Indian Act and, accordingly, that the Honobia Road project was exempt from the FPASA's advertising rules by operation of subsection (c)(15).

It is fairly debatable, we think, simply as a matter of language, whether a road constructed or repaired by an Indian-owned enterprise is a "product of Indian industry" within the meaning of the Buy Indian Act. But even if that Act could in isolation be construed to embrace road construction or repair, the petitioners' argument must still be rejected because of another provision of Title III of the FPASA expressly relating to contracts of the sort at issue here. Title 41 U. S. C. § 252 (e) (subsection (e)) states that § 252 (c) "shall not be construed to . . . permit any contract for the construction or repair of . . . roads . . . to be negotiated without advertising . . . , unless . . . negotiation of such contract is authorized by the provisions of paragraphs (1), (2), (3), (10), (11), (12), or (14) of subsection (c) of this section." [17] Not contained in this list of exceptions is subsection (c)(15). From this omission only one inference can be drawn: Congress meant to bar the negotiation of road construction and repair projects under the authority of laws like the Buy Indian Act. Where Congress explicitly enumerates certain exceptions to a

[17] Title 41 U. S. C. § 252 (e) provides in full:

"This section shall not be construed to (A) authorize the erection, repair, or furnishing of any public building or public improvement, but such authorization shall be required in the same manner as heretofore, or (B) permit any contract for the construction or repair of buildings, roads, sidewalks, sewers, mains, or similar items to be negotiated without advertising as required by section 253 of this title, unless such contract is to be performed outside the continental United States or unless negotiation of such contract is authorized by the provisions of paragraphs (1), (2), (3), (10), (11), (12), or (14) of subsection (c) of this section."

No contention has been made that paragraphs (1), (2), (3), (11), (12), or (14) of subsection (c) authorized negotiation of the Honobia Road project. As to paragraph (10), see n. 20, *infra*.

general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent. See *Continental Casualty Co.* v. *United States,* 314 U. S. 527, 533.[18]

In an attempt to avoid the obvious import of subsection (e), the petitioners argue that the subsection does not apply at all to cases in which the Buy Indian Act is involved. The petitioners reason that subsection (e) is concerned solely with procurement contracts whose negotiation is "permitted" by § 252, and that the negotiation authority afforded by the Buy Indian Act does not fit this description because that Act is a statute which of its own force operates independently of the FPASA.

We read the pertinent statutes differently. In the absence of subsection (c)(15), the Buy Indian Act could independently confer no authority on the BIA to avoid public advertising for competitive bids. Title 40 U. S. C. § 474 provides that "[t]he authority conferred by [the FPASA] shall be in addition and *paramount* to *any* authority conferred by any other law and shall not be subject to the provisions of *any* law inconsistent herewith. . . ." (Emphasis supplied.) In view of § 252's broad directive that all procurement proceed

---

[18] Nothing in the legislative history of the 1965 amendments to the FPASA points in a different direction than does the plain language of the statute. The petitioners cite the following passage found in several of the congressional Committee Reports that accompanied the 1949 version of the FPASA:

"For clarity [subsection (e)] provides that [41 U. S. C. § 252] does not authorize or change the existing requirements for authorization for the erection or repair of buildings, roads, sidewalks, or similar items." H. R. Rep. No. 670, 81st Cong., 1st Sess., pt. 1, p. 23 (1949); S. Rep. No. 338, 81st Cong., 1st Sess., 20 (1949); S. Rep. No. 475, 81st Cong., 1st Sess., 25 (1949).

This statement, however, sheds no light on the proper disposition of the instant case. It referred to the provisions of the FPASA at a time when that legislation governed no more than the General Services Administration and a few special procurements.

through advertising, the Buy Indian Act's contrary mandate would not have survived the 1965 amendments to the FPASA had Title III of the FPASA not contained subsection (c)(15). In short, § 252 (c) "permits" negotiation pursuant to the Buy Indian Act and, therefore, such negotiation is limited by the special rule applicable to road construction contained in subsection (e).[19]

We are, nonetheless, urged to disregard the plain meaning of subsection (e) because of the axiom that repeals by implication of longstanding statutory provisions are not favored. See *Universal Interpretive Shuttle Corp.* v. *Washington Metropolitan Area Transit Comm'n*, 393 U. S. 186, 193. The maxim is said to be particularly compelling here because the older statute is "remedial" legislation for the benefit of Indians. See *Morton* v. *Mancari*, 417 U. S. 535, 549–551. The 1965 amendments to the FPASA did not, however, "repeal" the Buy Indian Act. With the exception of the limited class of contracts enumerated in subsection (e), the FPASA did not in any manner displace the provisions of the Buy Indian Act. Moreover, "[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a

---

[19] Alternatively, the petitioners contend that subsection (e) does not govern here because of § 252 (a)(2). That provision states that §§ 251 through 260 of Title 41 "d[o] not apply . . . when [those sections are] made inapplicable pursuant to section 474 of title 40 or any other law. . . ." According to the petitioners, the Buy Indian Act is an "other law" within the intendment of § 252 (a)(2).

We disagree, reading subsection (a)(2) to refer exclusively to statutory provisions that—unlike the Buy Indian Act—in express terms exempt procurements from §§ 251 through 260 of Title 41 or from the FPASA in its entirety. Any broader reading of subsection (a)(2) would render subsection (c)(15) superfluous and would also substantially undermine Congress' desire that the requirements of § 254 apply "to contracts negotiated by executive agencies under *any* law, not only title III." S. Rep. No. 274, 89th Cong., 1st Sess., 2 (1965); H. R. Rep. No. 1166, 89th Cong., 1st Sess., 2 (1965). (Emphasis added.) See *id.,* at 2–3.

clearly expressed congressional intention to the contrary, to regard each as effective." *Morton* v. *Mancari, supra,* at 551. And, although the "rule by which legal ambiguities are resolved to the benefit of the Indians" is to be given "the broadest possible scope," "[a] canon of construction is not a license to disregard clear expressions of . . . congressional intent." *DeCoteau* v. *District County Court,* 420 U. S. 425, 447.

For the reasons stated, the judgment of the Court of Appeals is affirmed.[20]

*It is so ordered.*

---

[20] The petitioners have requested that, if their basic arguments are rejected, this case, nonetheless, be remanded to the Court of Appeals for further consideration in light of 41 U S. C. § 252 (c)(10), which authorizes the negotiation of Government contracts "for property or services for which it is impracticable to secure competition." The petitioners, however, did not rely on this statutory provision in defending this lawsuit in the District Court, and the Court of Appeals did not consider it. Our affirmance of the judgment of the Court of Appeals does not preclude the petitioners from seeking relief from the outstanding injunction on this ground or any other. See *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132, 165, n. 30. See also Fed. Rule Civ. Proc. 60 (b).