**MOTOR COACH INDUSTRIES, INC.,**
Hausman Bus Sales & Parts
Co., Appellees,

v.

**Elizabeth DOLE, Secretary of Department of Transportation, J. Lynn Helms, Administrator of Federal Aviation, First & Merchants National Bank, Defendants,**

and

**Eagle International Inc., American Coach Sales, Inc., Appellants.**

**MOTOR COACH INDUSTRIES, INC.;**
Hausman Bus Sales & Parts
Co.; Appellees,

v.

**Elizabeth DOLE, Secretary of Department of Transportation; J. Lynn Helms, Administrator of Federal Aviation; Appellants,**

and

**First Merchants National Bank; Eagle International Inc.; American Coach Sales, Inc.; Defendants.**

**MOTOR COACH INDUSTRIES, INC.;**
Hausman Bus Sales & Parts
Co.; Appellees,

v.

**FIRST & MERCHANTS NATIONAL BANK, Appellant,**

and

**Elizabeth Dole, Secretary of Department of Transportation; J. Lynn Helms, Administrator of Federal Aviation; Eagle International, Inc.; American Coach Sales, Inc.; Defendants.**

Nos. 83–1652(L), 83–1831 and 83–1832.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 3, 1983.

Decided Jan. 26, 1984.

Loren Kieve, Washington, D.C. (Gary C. Tepper, Steptoe & Johnson Chartered, Washington, D.C., J. Robert Brame, III, Roger W. Frydrychowski, McGuire, Woods & Battle, Richmond, Va., Elsie L. Munsell, U.S. Atty., Paula P. Newett, Asst. U.S. Atty., Alexandria, Va., on brief), for appellants.

George F. West, Jr., Alexandria, Va. (Murphy, McGettigan & West, P.C., Alexandria, Va., on brief), for appellees.

Before RUSSELL, SPROUSE and CHAPMAN, Circuit Judges.

SPROUSE, Circuit Judge:

This appeal arises out of an attempt by the Federal Aviation Administration (FAA) to channel funds to the Air Carriers Trust Fund (Trust) in order to purchase ground transport buses for Dulles International Airport.[1] Eagle International (Eagle) and Motor Coach Industries (MCI), the two principal bus manufacturers in the United States, competed for the contract to supply the vehicles, with Eagle ultimately receiving the award. MCI then brought this action against the FAA, the Trust, and Eagle to void the award, contending that the Trust, like the FAA itself, was subject to federal procurement guidelines which had not been followed. The district court agreed that public funds were involved in the contract to purchase the buses, enjoined the sale, and ordered that the trust corpus be paid into the United States Treasury. Eagle and the government appealed, but the government has since withdrawn its appeal. We affirm both the district court's ruling that the trust fund was public and its order that the trust corpus must be paid into the Treasury.

I

The FAA operates Dulles International and Washington National Airports through an agency known as the Metropolitan Washington Airports. It collects significant revenue from its operations by levying

---

1. The FAA operates both the Dulles International and Washington National Airports under a congressional grant of authority. Second Washington Airport Act, D.C.Code Ann. § 7–1201 et seq. (1981).

various landing and lounge fees against air carriers that service the airports.[2] In fiscal year 1980, these fees produced between $10,000,000 and $11,000,000 at Dulles International alone. The air carrier fees are remitted to the United States Treasury and are not used directly to supplement the airports' operating budgets. *See* 31 U.S.C. § 3302(b). The present controversy stems from an FAA-inspired plan to divert a portion of these fees to bolster bus service at Dulles.

The plan's genesis is found in the FAA's longtime concern about the underutilization of Dulles. Compared with its sister airport Washington National, Dulles has experienced a marked downturn over the years in the number of travelers using its facilities. Passengers apparently prefer the ready accessibility of Washington National, and the air carriers have responded by moving operations to that facility. The resulting congestion has created a potentially hazardous situation, prompting the FAA to explore ways of transferring part of Washington National's traffic flow to Dulles. This effort culminated in 1980 with a determination by the FAA that Dulles's utilization could best be improved by expanding bus transportation to and from the airport.

Rather than approach Congress for the necessary appropriations, FAA contacted the firm handling ground transportation at the airport about purchasing additional buses. The firm agreed that improvements needed to be made, but informed the FAA that it could not afford to acquire more buses. The FAA then contacted the airlines serving Dulles to solicit their assistance in securing the buses. An interwoven set of agreements designed to provide the necessary funds for ground transportation improvements emerged from these contacts.

The most important aspect of the agreements involved fees that the FAA normally charged airlines using Dulles. Under then-existing contracts with air carriers, the FAA levied landing and mobile fees for services it provided at the airport. Fees were based on air carrier weights and produced over $10 million annually in revenue. The FAA agreed to waive these fees after eliciting a promise from the airlines that they would establish and fund the Trust. The principal and income of the Trust were to be expended solely for the purchase of buses to provide ground transportation for Dulles. The waiver agreements were executed in January, 1980, and soon afterward the Trust was established.

The main feature of the Trust, and the one which concerns us on this appeal, is the funding mechanism. Participating airlines, now relieved of their landing fee responsibilities, were obligated to make monthly payments to the First and Merchant's National Bank, the trust administrator, based on an FAA-approved formula. In contrast to the pre-waiver agreement weight formula, the airlines' new obligations were calculated by multiplying each airline's monthly passenger load by seventy-seven cents per passenger. The FAA monitored airline ridership during the relevant periods to ensure the accuracy of the contributions and performed most of the administrative duties associated with collecting the per passenger fees. Projections placed the airlines' annual contributions under the formula at $3–4 million, which was $6 million less than they would have paid under the waived landing fee schedules. The expected savings from this arrangement virtually assured the airlines' participation in the trust plan.

Officially the airlines were the trust settlors, but the FAA maintained firm control over vital aspects of the Trust. The Trust's resources were dedicated to the objective of primary importance to the agency—securing suitable buses for Dulles. The trustees,

---

**2.** The FAA levies its fees pursuant to the Independent Offices Appropriation Act, 31 U.S.C. § 9701 (formerly codified at 31 U.S.C. § 483a), which provides that "[t]he head of each agency . . . may prescribe regulations establishing the charge for a service or thing of value provided by the agency." The purpose of the Act is to make agencies providing valuable services as self-sustaining as possible. 31 U.S.C. § 9701(a). The FAA retains the authority to waive these fees "if the need or desirability of such [a] waiver is indicated." *Metropolitan Washington Airports Cost Recovery Policy,* FAA *Order 5400.1A* §§ 7(1) and 7(2) (1978).

all airline officials, bore the responsibility of selecting the vehicles that best satisfied the airport's needs, but no expenditures from the Trust could be made without FAA authorization. Moreover, the terms of the Trust plainly stated that the beneficiary was the FAA and that accumulated funds not used for bus purchases would be paid into the United States Treasury when the agreement terminated on December 31, 1983.

All air carriers servicing Dulles agreed to the waiver and trust agreements except Air Florida. It continued to pay the FAA landing and mobile lounge fees under the old air carrier weight formula and made no per passenger contributions to the Trust.[3]

By the end of 1982, the trust corpus had swelled to nearly $3 million, enabling the FAA and the trustees to go forward with procurement plans. An FAA official informally notified Eagle and MCI about the airport's needs and requested that each manufacturer prepare proposals for various types of buses. These proposals were submitted for consideration to four FAA employees and one trust official, who selected Eagle to supply the buses. The procurement decision was made without soliciting bids through public advertisements or seeking detailed proposals based on written specifications.

MCI was notified of the decision and promptly brought suit in federal district court against Eagle and the FAA, alleging that the trust corpus was public money that had been expended in violation of federal procurement guidelines. All parties stipulated that federal procurement procedures had not been followed in the bus selection process, leaving the court to decide a single issue—whether the Trust was created with public funds. The district court heard the evidence in February, 1982 and, in a memorandum decision two months later, ruled that the trust corpus was public money and must be paid into the United States Treasury. Enforcement of the decision was stayed to enable Eagle and the government to appeal.

Eagle's principal contentions on appeal are that (1) MCI lacked standing to attack the purchase contract; (2) even if MCI had standing, the trial court erred in holding that the Trust was funded with public money; (3) the FAA had no duty to comply with federal procurement requirements; and (4) the trial court abused its discretion when it enjoined enforcement of the purchase contract.

## II

■ We first address the issue of standing.[4]

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute...." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The question is important on a constitutional level because it is tied to the courts' power to entertain the case; it is also important on a practical level because courts rely on the litigants' stake in the outcome to help sharpen and illuminate the presentation of the issues they must ultimately decide. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

■ Standing, unlike the mootness and ripeness requirements of article III, "focuses on the party seeking to get his complaint before a federal court and not on the issues

---

**3.** The trial court found Air Florida's situation to be convincing evidence that the FAA's waiver of fees was linked to the airlines' participation in the Trust. The court reasoned that Air Florida would not have continued to pay fees had it believed the waiver was anything but a *quid pro quo* for contributions to the Trust. Nor would the FAA continue to accept such fees if it understood its waiver to operate across-the-board for non-signatories and signatories alike.

**4.** Eagle suggests that MCI's motivation for bringing its challenge was not related to any legitimate interests of its own. We note that an interest in a competitive market may be sufficient to supply a litigant with standing to challenge an adverse agency decision. *See Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

he wishes to have adjudicated." *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). The determination is often difficult because not only must we be guided by the constitutional restrictions article III places on our role in the federal scheme, but we must also weigh evolving prudential rules of self-restraint going beyond constitutional considerations. *Gladstone,* 441 U.S. at 119, 99 S.Ct. at 1617 (Rehnquist, J., dissenting). The standing question, however, is made less troublesome when Congress has identified the litigant as someone entitled to pursue statutorily-created rights to the fullest extent permitted by article III. In these circumstances, our standing inquiry is narrowed to constitutional limitations alone, because Congress has displaced the need to independently invoke prudential rules of self-restraint. *Id.* at 100, 99 S.Ct. at 1608. *See also Consumers Union of the United States v. FTC,* 691 F.2d 575, 576 (D.C.Cir.1982) (en banc) (per curiam).

We are concerned with article III standing in this appeal. MCI brought its action against the FAA and Eagle under section 10 of the Administrative Procedures Act (APA), 5 U.S.C. § 702, which gives any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute" the right to seek federal court review. Of course, the prerequisite for the exercise of this right is that the party satisfy the threshold constitutional requirements of article III. The APA has broadened "the categories of injury that may be alleged in support of article III standing," but it has not displaced the analytical framework under which the constitutional determination is made. *Eastern Kentucky Welfare Rights,* 426 U.S. at 39, 96 S.Ct. at 1924. The focus of the constitutional inquiry must always be the party's "injury in fact"— whether he has suffered a sufficiently concrete injury to justify the invocation of the judiciary's remedial powers. The approaches used to guide this inquiry vary according to the context in which the suit arises. In the APA context, which is the provision with which we are concerned, the Supreme Court has stated that the article III requirements are satisfied when three elements are present in the party seeking relief from the court: (1) he must allege an actual injury within the zone of interests protected by the statute; (2) the injury must be fairly traceable to the specific agency action challenged; and (3) the alleged injury must be such that it likely would be redressed by a favorable decision. *Id.* at 38, 96 S.Ct. at 1924. *Data Processing Service Organizations v. Camp, supra. See also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. at 472, 102 S.Ct. at 758.

In contending that the first element necessary for standing is missing, Eagle asserts that MCI can identify no injury within the zone of interests protected by the Administrative Procedures Act and the Federal Property and Administrative Services Act.[5] We disagree. In fact, we

---

5. Eagle relies heavily on *Valley Forge Christian College v. Americans United for the Separation of Church and State, supra,* for its argument that MCI lacks standing. In *Valley Forge,* the Supreme Court emphasized that the standing requirement is more than a means of bringing issues into sharp focus, it is "a limitation on judicial power." 454 U.S. at 475, 102 S.Ct. at 760. *Valley Forge's* careful re-articulation of the standing formula reflects an unmistakable concern about the increasing use of the judiciary as a mechanism for resolving complex public issues by parties with no identifiable personal stake in the outcomes. *Valley Forge* instructs federal courts that they must adhere to the restrictions article III places on their power or risk disrupting the delicate balance that exists among co-equal branches of the federal government. We note, however, that *Valley Forge* dealt with a situation completely different than that faced here. The litigants there asserted no personal stake in the outcome of their challenge other than a nebulous interest rooted in the spending and establishment clauses of the United States Constitution. They predicated their claim on their standing as taxpayers and citizens, effectively arguing that their mere status as members of organized so-

decided essentially the same issue in *William F. Wilke, Inc. v. Department of the Army*, 485 F.2d 180 (4th Cir.1973). A competitor there had challenged a federal contract that was awarded to a company which had submitted its bid a few minutes late. We upheld the competitor's standing to bring its challenge under 5 U.S.C. § 702 despite the agency's seemingly minor infraction of the procurement guidelines:

> While those seeking Government contracts have no right to the award of a contract, they do have a right to reasonable treatment of their bids. This right derives from the combination of the statutory scheme regulating ... procurement ... and the review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

485 F.2d at 183 (citations omitted). *Wilke* placed this court in the company of those jurisdictions that have identified a "disappointed bidder" as a party with standing to enforce procurement statutes. Courts considering the issue since *Wilke* have uniformly adopted the same view. *See Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838 (D.C.Cir.1982); *Airco, Inc. v. Energy Research and Development Administration*, 528 F.2d 1294 (7th Cir.1975) (per curiam); *Armstrong & Armstrong, Inc. v. United States*, 514 F.2d 402 (9th Cir.1975) (per curiam); *Hayes International Corp. v. McLucas*, 509 F.2d 247 (5th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975).

Although Eagle strongly contests the point, there is also no question that MCI's injury was fairly traceable to the specific agency action being challenged. *Eastern Kentucky Welfare Rights, supra.* MCI's complaint before the district court alleged that the FAA had violated procurement policies in acquiring the buses. The Trust was the instrument the FAA used to make the purchases and, ultimately, its public or private nature determined the FAA's duties

under the procurement statutes. It makes no difference, then, whether we view the FAA or the Trust as the entity responsible for denying MCI the opportunity to bid under lawful procedures; its injury was caused by the actions of both. In fact, the FAA's and the Trust's identities essentially merged for the purposes of determining which entity's decisions made procurement outside the guidelines possible.

The final element of the APA standing formula—that the injury be redressable by a favorable decision—is also present here. *Wilke* makes it plain that, under appropriate circumstances, the federal courts have the power to enjoin a contract concluded in violation of the procurement statutes and implementing regulations. By voiding the contract between Eagle and the FAA in the instant case, the district court invoked that power to the substantial benefit of MCI, placing it in a position to compete on the same footing as Eagle when the bus contract is re-bid under the applicable procurement regulations.

### III

■ Turning to the merits, Eagle contends that the district court erred in ruling that the Trust was public—an extension of the FAA, funded with money belonging to the United States. It alludes to several cases which hold that federal participation or benefit is alone insufficient to make an entity a public instrumentality. *See, e.g., Neilson v. Lagow*, 53 U.S. (12 How.) 98, 13 L.Ed. 909 (1851). We agree that no single factor transforms an ostensibly private trust into an arm of the government. Whether a trust becomes a public instrumentality must be determined by analyzing the total factual circumstances surrounding its creation. *See, e.g., United States v. Orleans*, 425 U.S. 807, 815, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976) (whether an agency acts as an instrumentality of the

---

ciety was sufficient to invoke the judicial machinery. In contrast, MCI asserts both an economic interest in its loss of business and a statutorily-based interest in proper enforcement of the procurement statutes and implementing regulations. *William F. Wilke, Inc. v. Department of the Army*, 485 F.2d 180 (4th Cir.1973). Injuries to these categories of interests traditionally have been remediable through the courts. *Id.*

government depends on the day-to-day supervision over its operations by the government); *Lewis v. United States,* 680 F.2d 1239, 1240 (9th Cir.1982) (degree of control, source of finances, and public character of the agency's mission are important criteria for determining whether the entity is governmental in nature); *Federal Reserve Bank of St. Louis v. Metrocentre Improvement District No. 1,* 657 F.2d 183, 185 (8th Cir.1981) (the governmental or private character of the agency's function is important in determining whether it is a governmental instrumentality). We must consider, at a minimum, the purposes for which the trust was established; the public or private character of the entity spearheading the trust's creation; the identity of the trust's beneficiary and administrators; the degree of control exercised by the public agency over disbursements and other details of administration; and the method by which the trust is funded.

The Trust was established at the urging of the FAA to accomplish an objective it had long sought—improved public access to Dulles Airport. The documents governing the Trust not only made the FAA the sole beneficiary, but gave the agency a prominent, if not exclusive, role in the Trust's administration. The FAA established the airlines' contribution formula, monitored collections with its own staff, exercised final approval power over disbursements, and participated in every phase of the decision to award Eagle the bus contract.

The airlines concededly were named as the trust settlors and made contributions from their own revenues, but there is every indication that their role was nominal. They agreed to make contributions to the Trust only after the FAA decided to waive landing fees at Dulles, and there is ample evidence establishing a link between these two decisions. The waiver and Trust decisions not only were made contemporaneously and involved all the same parties, but the one airline that did not agree to the plan continued to pay its landing fees under the pre-waiver formula. The interrelationship between the waivers and the Trust is further demonstrated by the documents themselves. The preamble to the waiver agreement mentions the change in landing fees as one of the considerations prompting the parties to establish the fund to improve bus service. Similarly, Article III of the trust agreement declares that effectuating the waiver agreements is one of its primary purposes. In sum, the FAA's hand was visible in all critical aspects of the Trust—its creation, its funding, and its administration. The district court, therefore, was fully justified in concluding that the Trust and its assets were public in character.

## IV

Eagle next contends that, notwithstanding the public character of the Trust, the FAA had no obligation to follow federal procurement guidelines in awarding the bus contract. It bases its contention on section 6 of the Second Washington Airport Act, D.C.Code Ann. §§ 7–1201, 1206 (1981), which is the statute governing the FAA's operation of Dulles:

> The Administrator [of the FAA] is authorized to contract with any person for the furnishing of supplies or services at or upon [Dulles International Airport] necessary or desirable for the proper operation of the airport, including but not limited to ... such other services and supplies as may be necessary or desirable for the traveling public .... <u>The provisions of § 5 of Title 41, United States Code, shall not apply to contracts authorized under this section</u> .... [6]

The underscored language exempts the FAA from the public advertising require-

---

**6.** Eagle and MCI disagree as to whether this section even authorizes the FAA to purchase buses. Predictably, Eagle asserts that "such other services and supplies as may be necessary ... for the travelling public" includes buses. MCI takes the opposite view. Because we hold that any purchases made under this section are subject to the Federal Property and Administrative Services Act, we need not decide whether Congress contemplated the purchase of buses when drafting this section.

ments of 41 U.S.C. § 5 [7] when it is procuring goods or services for use at Dulles. Eagle, relying heavily on legislative history indicating that Congress intended the FAA to have as much latitude in its management of the airport as its private counterparts,[8] would stretch this exemption to include all procurement regulations—even those unrelated to advertising.

The Second Washington Airport Act's advertising provision was enacted in 1950, thirty-two years before the transaction at issue here. In the intervening period, federal procurement laws and implementing regulations have undergone major revisions. The most important changes in relation to Eagle's argument were the 1965 amendments to the Federal Property and Administrative Services Act (FPASA), 41 U.S.C. §§ 251–260, which is the organic authority for most of the regulations controlling procurement decisions. The amendments extended "[t]he regime of detailed contracting requirements contained in Title III of the FPASA, theretofore applicable only to the General Services Administration, ... [to] most other executive agencies." *Andrus v. Glover Construction Co.,* 446 U.S. 608, 614–15, 100 S.Ct. 1905, 1909–10, 64 L.Ed.2d 548 (1980). A few military-connected agencies still retain their

pre-1965 amendment status as agencies exempt from the FPASA's procurement guidelines, but most of their civilian counterparts do not.[9] 41 U.S.C. § 252(a)(1). Some of the newly-covered agencies—like the FAA—retain some parts of their pre-amendment exemption status but are otherwise subject to the full panoply of FPASA requirements. The FAA, for example, maintains its advertising exemption under the present statutory scheme, but it must comply with specific negotiation procedures. A brief analysis of the relevant provisions of the FPASA demonstrates clearly the extent of the FAA's obligations.

Agencies subject to the FPASA generally must procure goods and services through one of two methods: either they must advertise for bids, 41 U.S.C. §§ 252(b), 253; 41 C.F.R. §§ 1–2.000, 1–2.503–2 (1982), or procure by negotiation. 41 U.S.C. § 254; 41 C.F.R. §§ 1–3.000, 1–3.1220–20 (1982). The Act specifies which method must be followed in any given situation. *See* 41 U.S.C. § 252(c).

Congress, in enacting the 1965 amendments, was fully aware that it had earlier exempted many agencies from advertising when procuring goods or services,[10] and it provided a mechanism in

---

**7.** Before the 1965 amendments to the Federal Property and Administrative Services Act, 41 U.S.C. §§ 251–260, most federal agencies' advertising responsibilities were determined under 41 U.S.C. § 5, which provides that contracts valued at $10,000 or more "may be made or entered into only after advertising a sufficient time previously for proposals."

**8.** The source of Eagle's argument is the Secretary of Commerce's report to the Senate on the desirability of the exemption:

[L]egislation of the nature set forth in S. 456 is essential because the operation of an airport is a business enterprise, and if the Administrator of Civil Aeronautics is to execute this function so as to operate the airport insofar as practicable on a paying basis he should be granted legal authority which will place him in approximately *the same position as a privately owned organization providing the same type of service.* The legislation is well suited to accomplish this purpose. It would *remove certain legal impediments to the negotiation of contracts in the interest of the public with private individuals* . . . .

The only impediments to which the Secretary could have referred were the advertising requirements of the Public Advertising Act, 41 U.S.C. § 5. The FPASA's uniform scheme of procurement was not applicable to agencies other than the General Services Administration in 1950. This changed, however, in 1965 when Congress extended the reach of the FPASA to most federal agencies, effectively overriding all previously granted exemptions. *See Andrus v. Glover Constr. Co.,* 446 U.S. 608, 614–15, 100 S.Ct. 1905, 1909–10, 64 L.Ed.2d 548 (1980).

**9.** The FAA, like numerous other executive departments, is exempted from the FPASA's property *disposal* provisions. 40 U.S.C. § 474(14). No similar exemption exists for *procurement* provisions. 41 U.S.C. § 252(a)(1).

**10.** The legislative history of the 1965 amendments is not extensive. The available committee reports, however, plainly state that "[t]he Act's primary purpose [was] to make the modern code of procurement procedures contained in Title III of the Federal Property and Administrative Services Act of 1949 ... direct-

the new legislation for retaining those exemptions.[11] This mechanism essentially incorporates the exemptions granted under earlier statutes into the statutory framework of the FPASA itself.[12] 41 U.S.C. § 260. The section 260 "grandfather" clause, however, does not excuse the affected agencies from all the provisions of the FPASA—only from the Act's advertising requirements. *See* 41 U.S.C. § 252(c)(15). *See also Andrus v. Glover Construction Co.,* 446 U.S. at 617–18, 100 S.Ct. at 1910–11. The FPASA's other provisions, particularly those pertaining to procurement by negotiation, were made applicable to all agencies regardless of whether their pre-amendment advertising exemptions were carried forward. 41 U.S.C. §§ 252(c)(15), 254, 260. Congress's obvious purpose in limiting these exemptions was to subject all procurement decisions to uniform guidelines of some type.

Eagle urges an interpretation of the Second Washington Airport Act that would make the carefully-conceived statutory framework described above a nullity when applied to the FAA. Its reading of the Act's exemption language would enable the agency to expend large sums of public funds without any congressional guidance as to its proper disbursement. Even if we assume Eagle has accurately characterized congressional intent when the Second Washington Airport Act was enacted, Congress has limited the scope of that act by extending the complex procurement scheme of the FPASA to most executive agencies through the 1965 amendments. *See generally Glover Construction Co., supra.* These amendments not only increased the number of agencies subject to the procurement regulations, *see* 41 U.S.C. § 252(a)(2), but stated unequivocally that all agencies previously exempt from advertising must now comply with the negotiation requirements. 41 U.S.C. § 252(c)(15). There is nothing in the FPASA to indicate Congress intended to treat the FAA any differently than other agencies that retained their advertising exemptions under the 1965 amendments.[13]

## V

■ Eagle's next attack focuses on the injunctive relief the district court granted MCI. It points out that courts seldom enjoin enforcement of procurement contracts when a violation of the applicable regulations has occurred, and asks us to declare that the district court's grant of relief here was an abuse of its discretion.

We are not unsympathetic to Eagle's plight. It dealt with the Air Carriers Trust Fund in good faith and had no part in either the waiver agreements or the establishment of the Trust. It was an innocent player in the FAA's attempt to bypass normal appropriation channels, yet it faces the loss of a $3 million contract through no apparent fault of its own.

Normally, circumstances such as these would require the district court to deny

---

ly applicable . . . to executive agencies of the Government not now so covered." H.Rep. No. 1166, 1965 U.S.Code Cong. & Ad.News 4217. The reports noted that executive agency procurement policies prior to 1965 lacked uniformity. They identified the amendments as an attempt to reverse that situation by creating a common statutory scheme to control procurement decisionmaking. *Id.* The only agencies specifically exempted from this scheme were the Department of Defense, the Coast Guard and NASA.

**11.** 41 U.S.C. § 260. *See H.Rep. No. 1166,* 1965 U.S.Code Cong. & Ad.News 4223–24.

**12.** Section 260 states that all previously granted advertising exemptions would be treated as if they arose under the FPASA's § 252(c). This

section details the circumstances under which FPASA-covered agencies are free to procure without resorting to public bids and advertising.

**13.** Even though the FAA and Eagle began on the same side of this appeal, the agency has disagreed with Eagle's characterization of its procurement obligations. The agency has stated plainly that, in its view, the exemption only applies to advertising and does not free it from other FPASA obligations. The agency's peculiar expertise in the complex maze of federal procurement practices permits us to give substantial deference to the agency's view of its own responsibilities. *See, e.g., Alexander v. FERC,* 609 F.2d 543, 547–48 (D.C.Cir.1979); *Hayes Int'l Corp. v. McLucas,* 509 F.2d 247, 260 (5th Cir.1975).

MCI's request for injunctive relief, leaving it to seek money damages in the court of claims for any injuries it sustained because of the FAA's failure to comply with procurement guidelines. *See William F. Wilke, Inc. v. Department of the Army,* 485 F.2d at 182 (granting any relief to disappointed bidders is unusual). *See also M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1302 (D.C.Cir.1971) (the availability of the court of claims as a remedy counsels against the district court entertaining an application for injunctive relief). There are, however, sound reasons for treating the present situation differently from the normal case. The FAA's convoluted dealings did not constitute a technical violation of the FPASA, as is often the case in such challenges. *Cf. Wilke, supra* (involving the Army's consideration of a bid that was four minutes late). Rather, the agency completely ignored the Act's substantive and procedural requirements by using the Trust as a purchasing agent. Allowing the purchase contract to stand in such circumstances would soon make the procurement statutes little more than "dead letters on a page."

An even more compelling reason for affirming the injunctive relief is that the trust arrangement both undermined the integrity of the congressional appropriation process and ignored substantive duties under the procurement statutes. Viewed realistically, the Trust was an attempt by the FAA to divert funds from their intended destination—the United States Treasury. Although the purpose for which the FAA sought the funds was laudable, its methods certainly cannot be praised. Were the contract between the Trust and Eagle left intact, the agency's end-run around normal appropriation channels would have been successful,[14] enabling it effectively to supplement its budget by $3 million without congressional action. The injunction was the only effective means available to prevent such a result.

## VI

■ Eagle makes two other arguments that deserve brief mention: It contends that (1) MCI is estopped from challenging the procurement decision because it was a willing participant in the selection process and (2) the decision to award it the contract over MCI was rational and should be upheld on that basis. We reject both these contentions as meritless. "The doctrine of estoppel is used to prevent a litigant from asserting a claim or a defense against another party who has detrimentally changed his position in reliance upon the litigant's misrepresentation or failure to disclose some material fact." *Community Health Services v. Califano,* 698 F.2d 615, 620 (3rd Cir.1983). The principal factual misrepresentation here—that the Trust was privately funded and managed—was the result of the government's action, not MCI's. *Cf. Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam).

■ Eagle's rationality argument is similarly inapplicable to the instant case. We are not concerned with the merits of the procurement decision and have no opinion as to whether Eagle's buses are more suitable than MCI's. Were this the issue upon which relief was sought, we would have little difficulty sustaining the government's action, for our inquiry into this area is very limited. *See M. Steinthal & Co. v. Seamans,* 455 F.2d 1289 (D.C.Cir.1971).

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

14. While this appeal was pending, the FAA finally followed proper channels and requested budget authority from Congress to purchase the necessary buses. Congress appropriated $2.5 million for this purpose on August 15, 1983. The Department of Transportation and Related Agencies Appropriation Act, Pub.L. No. 98–78 (1983).