863 F.2d 883
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Rosemary GILMERR, et al., Plaintiffs-Appellants,
v.
Samuel PIERCE et al., Defendants-Appellees.
 No. 88-3189.
 United States Court of Appeals, Sixth Circuit.
 Dec. 9, 1988.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and RICHARD ENSLEN, District Judge.*
 PER CURIAM.
 
 
 1
 The plaintiffs, one of whom is a tenant of a federally-subsidized housing development and the rest of whom aspire to that status, brought this action in an effort to prevent the project from being sold under a contract that would require only two out of every three units in the project to be reserved for tenants receiving federal rent subsidies. The plaintiffs alleged that the decision to sell the project without requiring that all of the units be reserved for such tenants was arbitrary and capricious. The district court entered summary judgment for the defendants, and the plaintiffs have appealed. We shall affirm the judgment.
 
 
 2
 * The housing development in question, a 264-unit complex known as Briggs Court, is located in Columbus, Ohio. The project was built in 1958 and was financed with a federally insured mortgage. When the project was rehabilitated and the mortgage reinsured in 1976, 90 units were set aside for low income tenants receiving housing subsidies under Section 8 of the National Housing Act. The remainder of the units were reserved for rental at market rates.
 
 
 3
 In August of 1979 the project went into default and the mortgage was assigned to the Department of Housing and Urban Development. HUD instituted foreclosure proceedings in March of 1985, acquiring title to the property soon thereafter. HUD then contracted to sell the project to a private investor, Wilson Kaplan, for $1,861,962. Mr. Kaplan undertook to make certain repairs and to keep 178 of the 264 units reserved for Section 8 subsidy tenants for 15 years.[1]
 
 
 4
 Shortly after HUD became the owner of Briggs Court it commissioned Presidential Management Company to prepare an analysis of the incomes of the tenants living in the project. The stated goal of this study was to determine how many of the market rate tenants might be eligible for Section 8 assistance. The analysis showed that tenants in 170 of the project's units had incomes which qualified them for Section 8 subsidies.
 
 
 5
 HUD notified all of the tenants and various local and state authorities that it had acquired the project; their comments were invited on the pending proposal to sell the project to a private investor with 178 units reserved for Section 8 tenants. HUD received no adverse comments from any of the government agencies, any of the tenants, or any of the non-tenant plaintiffs in this case. The director of the Columbus Human Services Department stated that the "City is pleased" that the number of subsidized units in the development was being increased.
 
 
 6
 HUD's Columbus field office next conducted a "disposition analysis." It considered the local housing market, the state and local economy, the probable impact of the proposed disposition on the racial composition of the neighborhood, the feasibility of tenant ownership of units, the availability of comparable housing units in the area, and the overall need for low income housing units in the Columbus housing market. None of these factors seemed to militate against the proposed disposition.
 
 
 7
 The field office then prepared a formal recommendation that the development be sold on an "as is" basis for $1,861,962, that the purchaser be required to make $105,000 worth of specific repairs within four months, and that 170 units of the project be reserved for Section 8 subsidized tenants. The field office also filed a report summarizing its investigation of the reasons for the original default and foreclosure. The report laid blame for the project's failure on vandalism, weather damage, vacancies, poor management, and a soft rental market.
 
 
 8
 The disposition recommendation was approved by the director of the field office, by HUD's field counsel, and by the appropriate HUD authorities in Washington. (Washington made one minor modification not relevant here.)
 
 
 9
 This lawsuit was then filed against the Secretary of HUD and Mr. Kaplan, the purchaser. The plaintiffs took exception to the substance of HUD's deal with Mr. Kaplan and to the process by which HUD arrived at the decision to sell on those terms. Additional plaintiffs were allowed to intervene in the action, and Mr. Kaplan was dropped as a defendant. The plaintiffs moved for certification of a class of all similarly situated low-income tenants in the area.
 
 
 10
 The Secretary moved for summary judgment. The district court granted the motion for summary judgment on December 28, 1987, without having ruled on the pending motion for class certification. This appeal followed.
 
 II
 
 11
 For the first time, the government suggests on appeal that the plaintiffs lacked standing to bring this action. Standing is a jurisdictional requirement, and must therefore be considered even at this late date.
 
 
 12
 Article III of the United States Constitution restricts exercise of the "Judicial Power" to "Cases" and "Controversies." The case or controversy requirement of Article III necessitates an allegation of "injury in fact." The complaint must describe a distinct and palpable injury, must allege some causal connection between that injury and the conduct complained of, and must advance some legally cognizable claim for redress. See Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471-75 (1982). The Administrative Procedure Act, the statute under which the instant action is brought, deals with standing in the following terms:
 
 
 13
 "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."
 
 
 14
 5 U.S.C. Sec. 702.
 
 
 15
 Although we are aware of no cases addressing the standing of would-be recipients of low income housing subsidies, there is a large body of analogous cases in which rejected bidders for government contracts are treated as aggrieved persons who have standing to sue. See, e.g., Motor Coach Industries, Inc. v. Dole, 725 F.2d 958, 963-64 (4th Cir.1984). If an unsuccessful bidder for a government contract has standing to challenge the government's award of a contract to another, either because the government acted arbitrarily and capriciously in making its decision or because the government violated its own regulations, we think a would-be subsidized tenant at Briggs Court probably has standing to challenge an allegedly arbitrary and capricious decision not to make Briggs Court apartments available to such tenants.
 
 III
 
 16
 We turn now to the merits of the claim that HUD acted arbitrarily and capriciously in selling the project without requiring that all of the units be rented to Section 8 tenants. The plaintiffs assert that the process by which HUD reached its decision was flawed, and they assert that HUD violated certain regulations that have the force of law. Compare Cowherd v. United States Department of Housing and Urban Development, 827 F.2d 40, 42, 44 (7th Cir.1987).
 
 
 17
 * In dealing with challenges to agency action as "arbitrary and capricious," a court must decide first whether the Secretary acted within the scope of his authority. Second, the court must decide whether the decision was "based on a consideration of the relevant factors" and whether a clear error of judgment was committed. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971). Finally, the court must examine the rationale for the agency's decision, asking whether the agency has articulated a "rational connection between the facts found and the choice made." Bowman Transportation, Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285 (1974), quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).
 
 
 18
 The plaintiffs in this case do not argue that the Secretary exceeded the scope of his authority. They must therefore establish that the agency failed to consider the relevant factors, that a clear error of judgment was made, or that the process by which HUD arrived at its decision was irrational.
 
 
 19
 The factors that the Secretary was required to consider are set forth at 12 U.S.C. Sec. 1701z-11:
 
 
 20
 "It is the policy of the United States that the Secretary of Housing and Urban Development ... shall manage and dispose of multi-family housing projects which are owned by the Secretary in a manner ... which will protect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of--
 
 
 21
 (1) preserving the housing units so that they can remain available to and affordable by low and moderate income families;
 
 
 22
 (2) preserving and revitalizing residential neighborhoods;
 
 
 23
 (3) maintaining the existing housing stock in a decent, safe, and sanitary condition;
 
 
 24
 (4) minimizing the involuntary displacement of tenants; and
 
 
 25
 (5) minimizing the need to demolish projects.
 
 
 26
 The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals relating to individual projects in a manner which will further the achievement of the overall purpose of this section."[2]
 
 
 27
 The Secretary unquestionably considered these policy goals, and we are in no position to say that his decision did not further them. The number of housing units available to low and moderate-income families was not merely "preserved," it was increased. The Secretary's effort to place the project on a sounder economic footing tended to preserve and revitalize the neighborhood. The requirement that the new owner make various repairs promoted the goal of maintaining the quality of the housing stock. The requirement that 178 of the units be set aside for recipients of rent subsidies served both to minimize involuntary displacement of tenants and to minimize any need for demolition.
 
 
 28
 The plaintiffs claim that the decision to sell Briggs Court without requiring that 100% of the units be subsidized was arrived at by officials who labored under the misapprehension that the project was "formerly unsubsidized." In support of this argument they point to documents in which HUD's field counsel and the Deputy Director of the Office of Multifamily Management erroneously refer to the project in those terms. It is clear from the record, however, that responsible decisionmakers at both the Columbus and Washington levels considered the disposition in light of criteria relevant only to the disposition of formerly subsidized projects, and the decision to dispose of the project on the conditions described was not based on any mistake of fact regarding the project's prior status.
 
 
 29
 The plaintiffs also claim that the tenant income analysis was fatally flawed because it was performed by an outside contractor and because the methodology used led to undercounting of tenants eligible for Section 8 subsidies. Courts have approved income surveys quite similar to the one performed here, however, noting that HUD is not required to gather "the most current available demographic information." See Alschuler v. Department of Housing and Urban Development, 686 F.2d 472, 482 (7th Cir.1982). The decision to use an outside contractor is totally unexceptionable, of course.
 
 B
 
 30
 Interwoven with the plaintiffs' argument that the process by which HUD arrived at its decision was flawed is an argument that the decision violated HUD's own regulations. The plaintiffs cite 24 C.F.R. Sec. 290.27, which provides in pertinent part as follows:
 
 
 31
 "(a) A formerly subsidized project shall be allocated subsidy for the longest possible term of the subsidy contract, pursuant to 24 CFR Part 886, subpart B or C.
 
 
 32
 (b) A formerly subsidized project shall be allocated subsidy pursuant to 24 CFR Part 886, subpart B or C, sufficient to assist 100% of the units. Provided, however, that the Director may recommend disposition for less than 100% of the units if the Director makes a written finding that such a sale will promote a racially mixed or mixed income tenancy and the amount of subsidy provided is at least sufficient to assist all eligible tenants residing in the project."
 
 
 33
 (Emphasis added.) Although the Secretary may waive compliance with this section for good cause shown, see 24 C.F.R. Sec. 290.7, the plaintiffs contend that there was no such waiver here.
 
 
 34
 The Secretary argues that Sec. 290.27(b) was fully complied with, and we agree. It seems self-evident that renting some of the units under the Section 8 subsidy program and some at a market rate is likely to promote a mixed income tenancy, and the plaintiffs have offered no reason to suppose otherwise. The requirement that the number of units reserved for subsidized tenants be sufficient to accomodate all eligible tenants currently residing in the project is also met. The whole purpose of the tenant income analysis was to determine the number of existing tenants who were financially eligible for Section 8 assistance, and the allocation of 170 units for subsidized tenants was based directly on that survey. The formal requirement of "a written finding" by "the Director" has also been met. The "Disposition Questionnaire," an "Attachment to Form HUD--9650," recites that "less than 100 percent subsidy [will] promote a racially mixed or mixed income tenancy" and "subsidy [will] be provided to all eligible tenants." (Emphasis supplied.) Form 9650, the "Disposition Recommendation for HUD--Owned Multifamily Projects," was approved in due course by Steven Havens, the Acting Field Office Manager of HUD's Columbus office. Since Havens is the "Director" required to make those findings, see 24 C.F.R. Sec. 290.5(a), his approval of Form 9650 meets the requirements of Sec. 290.27(b).
 
 
 35
 For the foregoing reasons, we AFFIRM the judgment of the district court.
 
 
 
 *
 The Honorable Richard Enslen, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 At times, the record refers to a figure of 170 units. HUD apparently concluded during its initial review that 170 units should be reserved for Section 8 tenants, but at some point in the review process the figure was increased to 178
 
 
 [2]
 This is how the statute read at the time HUD made the decision now being challenged by the plaintiffs. In their reply brief, the plaintiffs introduce an argument that the Secretary's decision should be evaluated by reference to Sec. 1701z-11 as it now reads, after being amended by Congress in February 1988. The argument is obviously frivolous