DYK, Circuit Judge,
dissenting.
The majority, reversing the Merit Systems Protection Board (“Board”), holds that hundreds of thousands of federal employees — designated as holding national security positions — do not have the right to appeal the merits of adverse actions to the Board simply because the Department of Defense has decided that such appeals should not be allowed.
The majority reaches this conclusion even though the Civil Service Reform Act of 1978 (“CSRA”), 5 U.S.C. § 1101 et seq., unquestionably gives these employees the right to appeal the merits of adverse agency personnel actions to the Board, and Congress has acted specifically to deny Board jurisdiction under the CSRA with respect to certain national security agencies — the Central Intelligence Agency (“CIA”), the Federal Bureau of Investigation (“FBI”), and intelligence components of the Department of Defense — but has not exempted the non-intelligence components of the Department of Defense involved here. And the majority reaches this conclusion despite the fact that Congress in 2003 authorized the Department of Defense to create just such an exemption for its non-intelligence components and then repealed that authorization in 2009. The majority offers little explanation as to how its decision can be consistent with the CSRA other than to dismissively state that “no controlling congressional act is present here.” Majority Op. at 1229.
The majority’s sole ground for its reversal of the Board is the Supreme Court’s decision in Department of the Navy v. Egan, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). What the Supreme Court itself characterized as the “narrow” decision in Egan does not remotely support the majority’s position. See id. at 520, 108 S.Ct. 818. It simply holds that where access to classified information is a necessary qualification for a federal position, revocation of a security clearance pursuant to the predecessor of Executive Order No. 12,968, 60 Fed. Reg. 40,245 (Aug. 2, 1995), is a ground for removal, and that the merits of the security clearance revocation are outside the Board’s jurisdiction. The employees’ positions here required no such access, and the employees in question had no security clearances. Far from supporting elimination of Board jurisdiction in such circumstances, Egan explicitly recognized that national security employees could challenge their removal before the Board. 484 U.S. at 523 n. 4, 108 S.Ct. 818 (noting that where the agency fails to invoke the summary removal procedures of 5 U.S.C. § 7532, an employee’s “removal ... presumably would be subject to Board review as provided in § 7513.”).
The breadth of the majority’s decision is exemplified by the low level positions involved in this very case. Ms. Conyers served as a GS-05 Accounting Technician (approximately $32,000 to $42,000 annual *1238 salary range) at the Defense Finance and Accounting Service. Mr. Northover was employed by the Defense Commissary Agency as a GS-07 Commissary Management Specialist (approximately $89,000 to $50,000 annual salary range), where he performed inventory control and stock management duties. I respectfully dissent.[1]
I
At the outset, it is important to be clear about the exact nature of the majority’s decision. Under the majority’s expansive holding, where an employee’s position is designated as a national security position, see 5 C.F.R. § 732.201(a),[2] the Board lacks jurisdiction to review the underlying merits of any removal, suspension, demotion, or other adverse employment action eovered by 5 U.S.C. § 7512. The majority holds that “the Board cannot review the merits of Executive Branch agencies’ national security determinations concerning eligibility of an employee to occupy a sensitive position that implicates national security.” Majority Op. at 1237. The majority concedes that its holding renders “adverse actions of this type [] largely unreviewable.”[3] Majority Op. at 1236 n.22. Thus, the majority’s holding forecloses the statutorily-provided review of the merits of adverse employment actions taken against civil service employees merely because those employees occupy a position designated by the agency as a national security position.
The majority’s holding allows agencies to take adverse actions against employees for illegitimate reasons, and have those *1239 decisions shielded from review simply by designating the basis for the adverse action as “ineligibility to occupy a sensitive position.” As the Board points out, the principle adopted by the majority not only precludes review of the merits of adverse actions, it would also “preclude Board and judicial review of whistleblower retaliation and a whole host of other constitutional and statutory violations for federal employees subjected to otherwise appealable removals and other adverse actions.” Board Br. at 35. This effect is explicitly conceded by OPM, which agrees that the agency’s “liability for damages for alleged discrimination or retaliation” would not be subject to review. OPM Br. at 25.
OPM’s concession is grounded in existing law since the majority expands Egan to cover all “national security” positions, and Egan has been held to foreclose whistle-blower, discrimination, and other constitutional claims. Relying on Egan, we have held that the Board lacks jurisdiction where a petitioner alleges that his security clearance had been revoked in retaliation for whistleblowing. See Hesse v. Dep’t of State, 217 F.3d 1372, 1377-80 (Fed.Cir.2000), cert. denied, 531 U.S. 1154, 121 S.Ct. 1103, 148 L.Ed.2d 974 (2001). So too, the majority’s decision renders unreviewable all claims of discrimination by employees in national security positions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Several circuits have held that courts lack jurisdiction to adjudicate discrimination claims where the adverse action is based on a security clearance revocation because “a Title VII analysis necessarily requires the court to perform some review of the merits of the security clearance decision,” which is prohibited by Egan. Brazil v. U.S. Dep’t of the Navy, 66 F.3d 193, 196 (9th Cir.1995); see Bennett v. Chertoff, 425 F.3d 999, 1003 (D.C.Cir.2005) (“While [the plaintiff] claims that [the agency’s] security clearance explanation is pretextual, ... a court cannot adjudicate the credibility of that claim.”).[4] Indeed, in this case, Mr. North-over’s discrimination claims were dismissed without prejudice pending the outcome of this appeal. Constitutional claims by employees occupying national security positions are also barred by the majority’s decision despite the majority’s contrary protestations. In El-Ganayni v. U.S. Department of Energy, 591 F.3d 176, 184-86 (3d Cir.2010), the Third Circuit held that a plaintiff could not prevail on his First Amendment and Fifth Amendment claims where he alleged his security clearance had been revoked in retaliation for constitutionally protected speech and/or based on his religion and national origin.
II
The majority completely fails to come to grips with the statute, the fact that it provides for review of the merits of the adverse agency action involved here, and that the majority’s holding effectively nullifies the statute.
The primary purpose of the CSRA — ■ providing review of agencies’ adverse employment actions — was to ensure that “[e]mployees are ... protected against arbitrary action, personal favoritism, and from partisan political coercion.” S.Rep. No. 95-969, at 19 (1978), reprinted in 1978 U.S.C.C.A.N. 2723, 2741. In order to ensure such protection, the CSRA created *1240 the Board to be “a quasi-judicial body, empowered to determine when abuses or violations of law have occurred, and to order corrective action.” Id. at 24. The protections were afforded to the vast majority of employees of the executive branch.
Subchapter II of Chapter 75 of the CSRA explicitly gives every “employee” the right to seek Board review of adverse employment actions. 5 U.S.C. § 7513(d); see also id. § 7701. The term “employee” is defined to include all employees in the competitive or excepted services[5] who are not serving a probationary period or under temporary appointment, and who, in the case of excepted service employees, has completed two years of specified service.[6] An employee is entitled to appeal “a removal,” “a suspension for more than 14 days,” “a reduction in grade” or pay, or “a furlough of 30 days or less” to the Board. Id. § 7512.
In order to determine whether an adverse action constitutes arbitrary agency action, the Board necessarily examines the merits of the underlying agency decision.[7] Under 5 U.S.C. § 7513, an agency may take an adverse employment action against an employee “only for such cause as will promote the efficiency of the service.” Id. § 7513(a). In order to demonstrate that the adverse action will promote the efficiency of the service, “the agency must show by preponderant evidence that there is a nexus between the misconduct and the work of the agency, i.e., that the employee’s misconduct is likely to have an adverse impact on the agency’s performance of its functions.” Brown v. Dep’t of the Navy, 229 F.3d 1356, 1358 (Fed.Cir.2000). In evaluating whether the agency has satisfied the nexus requirement, “[t]he Board routinely evaluates such factors as loyalty, trustworthiness, and judgment in determining whether an employee’s discharge *1241 will promote the efficiency of the service.” James v. Dale, 355 F.3d 1375, 1379 (Fed.Cir.2004) (quoting Egan, 484 U.S. at 537 n. 1, 108 S.Ct. 818 (White, J., dissenting)). This merits evaluation is not modified merely because the removal is cloaked under the cloth of being “in the interests of national security.”
The decision by Congress to afford such review to the great majority of federal employees is made clear from the history of the CSRA. Initially, review of adverse actions was extended only to preference eligibles.[8] See United States v. Fausto, 484 U.S. 439, 444, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). In 1978, Subchapter II of Chapter 75 of the CSRA was enacted to extend protections to employees in the competitive service in addition to preference eligibles, but generally not to employees in the excepted service. See Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 204(a), 92 Stat. 1111. In United States v. Fausto, 484 U.S. at 444, 455, 108 S.Ct. 668, the Supreme Court held that the CSRA did not cover non-preference eligible excepted service employees and that such employees could also not seek review of an adverse action in a suit for back pay in what is now the United States Court of Federal Claims.
In 1990, in response to Fausto, Congress expanded the CSRA to apply to all federal government employees in the competitive and excepted services with narrow exceptions (discussed below). See Civil Service Due Process Amendments, Pub. L. No. 101-376, 104 Stat. 461 (1990). In expanding the CSRA’s reach to include employees in the excepted service, Congress recognized that “no matter how an employee is initially hired, that employee aequires certain expectations about continued employment with the Government.... [Excepted service employees] should have the same right to be free from arbitrary removal as do competitive service employees.” H.R.Rep. No. 101-328, at 4 (1989), reprinted in 1990 U.S.C.C.A.N. 695, 698.
Both Ms. Conyers and Mr. Northover held permanent positions in the competitive service and both had completed more than one year of “current continuous service under other than a temporary appointment.” Thus, both fall squarely within the definition of “employee” under the statute. Ms. Conyers was indefinitely suspended and Mr. Northover was reduced in grade, both adverse actions which entitle them to seek Board review. Thus, the Board had jurisdiction over both Ms. Conyers’s and Mr. Northover’s appeals.
That Congress clearly intended that Board review extend to these employees is made apparent by Congress’s decision to craft specific exceptions to Board jurisdiction where national security was a concern, and not to extend such exceptions to the positions involved here. In expanding the CSRA’s coverage to excepted service employees in 1990, Congress created exceptions for specified employees based on national security concerns. Congress excluded particular government agencies, such as the FBI and the National Security Agency (“NSA”), “because of their sensitive missions,” and also recognized that other agencies, such as the CIA, had already been specifically excluded from the CSRA by separate statute. Id. at 5. In 1996, the exceptions were expanded to cover all “intelligence component[s] of the Department of Defense.”[9] 5 U.S.C. § 7511(b).
*1242 Congress’s decision to specifically exempt certain national security positions from the protections of the CSRA provides strong evidence that it intended that Board review extend to other positions classified as national security positions that were not exempted. As the Supreme Court noted in United States v. Brockamp, 519 U.S. 347, 352, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997), an “explicit listing of exceptions ... indicate^] to us that Congress did not intend courts to read other unmentioned ... exceptions into the statute that it wrote.” See also TRW Inc. v. Andrews, 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (“Where Congress explicitly enumerates certain exceptions ... additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.” (quoting Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980))). The governing principle is simple enough. Where Congress has crafted some exceptions for national security and not others, employees are entitled to Board review of the merits of adverse employment actions, regardless of the Department of Defense’s or the majority’s views that additional exceptions for national security positions would be desirable. Significantly too, in enacting 5 U.S.C. § 7532,[10] Congress provided an alternative mechanism to bypass the Board for national security purposes — an alternative not invoked here.
The majority contends that Congress’s decision to exempt the FBI, CIA, and intelligence components of the Department of Defense based on national security concerns is “speculative because ‘national security’ was not a factor providing for these exclusions.” Majority Op. at 1229 n.8. The majority is clearly mistaken, as both the language and the legislative history of the exemptions created for these agencies demonstrate that these exemptions were specifically granted based on the potential impact that employees in these agencies could have on national security.
Adverse actions taken against CIA employees are governed by 50 U.S.C. § 403-4a, which was originally enacted pursuant to the National Security Act of 1947, Pub. L. No. 80-253, § 102(c), 61 Stat. 495, 498. In enacting the National Security Act of 1947, Congress acknowledged that one of the central purposes of the Act was to “establish[] a structure fully capable of *1243 safeguarding our national security promptly and effectively.” S.Rep. No. 80-239, at 2 (1947) (emphasis added). To that end, Congress provided the Director of the CIA plenary authority to “terminate the employment of any officer or employee of the [CIA] whenever he shall deem such termination necessary or advisable in the interests of the United States.” Pub. L. No. 80-253, § 102(c); see also 50 U.S.C. § 403-4a(e)(l).
In 1964, Congress crafted a similar exemption for employees of the NSA, modeling it after that created for the CIA in 1947. See Act of Mar. 26, 1964, Pub. L. No. 88-290, § 303(a), 78 Stat. 168, 169. In providing this exemption, Congress explicitly recognized that “[t]he responsibilities assigned to the [NSA] are so great, and the consequences of error so devastating, that authority to deviate from a proposed uniform loyalty program for Federal employees should be granted to this Agency.” S.Rep. No. 88-926, at 2 (1964), 1964 U.S.C.C.A.N. 2114, 2115. Congress also noted that the exemption “recognizes the principle that the responsibility for control of those persons who are to have access to highly classified information should be accompanied by commensurate authority to terminate their employment when their retention and continued access to extremely sensitive information is not clearly consistent with the national security.” Id. (emphasis added).
When Congress expanded Chapter 75 to cover employees in the excepted service in 1990, it continued to exclude the FBI, CIA, and NSA, acknowledging that “[t]he National Security Act of 1946 [sic] provides the Director of the [CIA] with plenary authority to deal with personnel of the CIA,” and explained that it had “preserved the status quo in relation to the FBI and NSA because of their sensitive missions.” See H.R.Rep. No. 101-328, at 5 (emphasis added). In 1996, Congress passed the National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201, 110 Stat. 2422 (1996), creating a new exemption for all “intelligence components of the Department of Defense,” id. §§ 1632-33. This exemption is codified at 10 U.S.C. §§ 1609 and 1612, which explicitly provide the Secretary of Defense with authority to take adverse action against certain employees where “the procedures prescribed in other provisions of law [i.e. the provisions of Chapter 75] ... cannot be invoked in a manner consistent with the national security.” 10 U.S.C. § 1609(a)(2) (emphasis added); see also id. § 1612 (“Notwithstanding any provision of chapter 75 of title 5, an appeal of an adverse action by an individual employee ... shall be determined within the Department of Defense.”). Thus, that Congress intended to exclude these agencies from the protections of Chapter 75 for national security reasons is undeniable.
The majority also appears to argue that Congress’s decision to craft other exemptions for employees of other government agencies is somehow inconsistent with the notion that Congress’s exclusion of the FBI, CIA, and NSA was for national security reasons. However, Congress, in enacting the CSRA, excluded certain non-intelligence agencies, such as the General Accounting Office, the Veterans Health Sciences and Research Administration, the Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority because the employees of these agencies were already provided with appeal rights through alternative mechanisms. See H.R.Rep. No. 101-328, at 5.
Finally, if Congress’s legislative creation of certain exemptions based upon national security concerns were not enough to refute the majority’s construction, there has also been an express decision by Congress to deny the national security exemptions *1244 claimed here by the Department of Defense for its non-intelligence components. In 2003, Congress enacted legislation that allowed the Department of Defense to exclude employees holding national security positions from the review procedures provided by Chapter 75 of the CSRA. See National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1101, 117 Stat. 1392 (2003). This legislation provided that the Secretary may “establish ... a human resources management system [the National Security Personnel System (“NSPS”)] for some or all of the organizational or functional units of the Department of Defense.” Id. § 1101(a) (codified at 5 U.S.C. § 9902(a)) (emphasis added). Among other things, the Secretary was permitted to promulgate regulations to “establish an appeals process that provides employees ... fair treatment in any appeals that they bring in decisions relating to their employment.” Id. (codified at 5 U.S.C. § 9902(h)(1)(A)). Following the Secretary’s promulgation of such regulations, “[l]egal standards and precedents applied before the effective date of [the NSPS] by the [Board] and the courts under chapters 43, 75, and 77 of [the CSRA] shall apply to employees of organizational and functional units included in the [NSPS], unless such standards and precedents are inconsistent with legal standards established [by the Secretary].” Id. (codified at 5 U.S.C. § 9902(h)(3)) (emphasis added). In other words, the Secretary’s regulations could bar review by the Board.
Pursuant to the statutory authorization, the Secretary promulgated regulations that in fact limited the Board’s authority. See Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed. Reg. 66,116 (Nov. 1, 2005). Under the regulations, “[w]here it is determined that the initial [Board] decision has a direct and substantial adverse impact on the Department’s national security mission, ... a final [Department of Defense] decision will be issued modifying or reversing that initial [Board] decision.” Id. at 66,210 (codified at 5 C.F.R. § 9901.807(g)(2)(ii)(B)). Thus, a Board decision reversing an agency’s adverse action was subject to veto by the agency if it was determined to have “a direct and substantial adverse impact on the Department’s national security mission” — a less draconian version of the agency authority asserted here. Also, under the regulations, if the Secretary determined “in his or her sole, exclusive, and unreviewable discretion [that an offense] has a direct and substantial adverse impact on the Department’s national security mission,” id. at 66,190 (codified at 5 C.F.R. § 9901.103) (emphasis added), the Board could not mitigate the penalty for such an offense, id. at 66,210 (codified at 5 C.F.R. § 9901.808(b)).
On January 28, 2008, Congress amended the NSPS statute to eliminate the Department of Defense’s authority to create a separate appeals process and invalidate the existing regulations limiting Board authority established by the Secretary, see National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1106(a), (b)(3), 122 Stat. 3, 349, 356-57, bringing the “NSPS under Government-wide rules for disciplinary actions and employee appeals of adverse actions,” National Security Personnel System, 73 Fed. Reg. 56,344, 56,346 (Sept. 26, 2008).[11] The repeal of the Department of Defense’s au *1245 thority to create a separate appeals process (exempting employees from Board review) and the repeal of Secretary’s regulations implementing this appeals process demonstrate conclusively that Congress intended to preclude the Department of Defense from insulating adverse employment decisions as to employees of non-intelligence components from Board review on the merits.
The majority’s argument to the contrary is unconvincing. The majority is incorrect in suggesting that the repeal of these provisions was due to concerns about collective bargaining. See Majority Op. at 1229-30 n.8. In fact, the provisions of the NSPS limiting collective bargaining were addressed in a 2008 amendment to a separate provision in response to litigation brought by labor organizations on behalf of Department of Defense employees.[12] See Am. Fed’n of Gov’t Emps., AFL-CIO v. Gates, 486 F.3d 1316 (D.C.Cir.2007). The 2008 amendment to the collective bargaining provisions had nothing to do with the repeal of the Chapter 75 exemption authority or the repeal of the regulations restricting adverse action appeal rights. As the Department of Defense itself noted, the restoration of adverse action appeal rights to its employees was designed to “[b]ring[] NSPS under Governmentwide rules for disciplinary actions and employee appeals of adverse actions.” National Security Personnel System, 73 Fed. Reg. at 56,346. The Department of Defense cannot now claim authority specifically denied by Congress.
Ill
The majority suggests that cases such as Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), and Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), recognizing the existence of Presidential authority to act even when Congress has not, support the agency action here. See Majority Op. at 1230. There are three serious flaws with this argument. First, as the majority itself recognizes, the President cannot act contrary to congressional legislation except perhaps in the most unusual circumstances — which are not claimed to exist here.[13] As described immediately above, Congress has acted to provide for Board review.
Second, this case does not involve a Presidential action. Dames and Youngstown both involved agency action taken pursuant to an Executive Order of the President. See Dames, 453 U.S. at 662-63, 101 S.Ct. 2972 (Executive Order authorized the Secretary of the Treasury to promulgate regulations to block the removal or transfer of all property held by the government of Iran); Youngstown, 343 U.S. at 582-83, 72 S.Ct. 863 (Executive Order directed the Secretary of Commerce to seize the nation’s steel mills). The only Executive Orders that are potentially relevant here are Executive Order No. 12,968, 60 Fed. Reg. 40,245, and Executive Order No. 10,450, 18 Fed. Reg. 2489. Neither grants the agency the authority it now seeks.
Executive Order No. 12,968, prior versions of which formed the basis for Egan, *1246 relates exclusively to “access to classified information.” It delegates to the heads of executive agencies the responsibility to “establish[] and maintain!] an effective program to ensure that access to classified information by each employee is clearly consistent with the interests of the national security,” and sets forth the conditions under which employees may be granted access to classified information. Exec. Order No. 12,968, § 1.2(b)-(e), 60 Fed. Reg. at 40,246-47. It provides that an agency’s decision to revoke an employee’s security clearance shall be “final.” Id. § 5.2(b). Executive Order No. 12,968 has nothing to do with this case because the agency’s adverse employment actions against Ms. Conyers and Mr. Northover were not based on denials of eligibility to access classified information, and neither position involved in this case required a security clearance or access to classified information.
Executive Order No. 10,450 provides that the heads of government agencies and departments “shall be responsible for establishing and maintaining within [their] department or agency an effective program to insure that the employment and retention in employment of any civilian officer or employee within the department or agency is clearly consistent with the interests of the national security.” Exec. Order No. 10,450, § 2, 18 Fed. Reg. at 2489. The order also delegates to agencies the authority to determine investigative requirements for positions “according to the degree of adverse effect the occupant of the position ... could bring about ... on the national security.” Id. § 3; see also 5 C.F.R. § 732.201 (setting forth the three levels of sensitivity). Nothing in the order in any way suggests that those falling into a sensitive category should be exempt from Board review. Rather, the order provides for the alternative removal mechanism provided in section 7532. Where an agency head determines that continued employment of an employee is not “clearly consistent with the interests of the national security,” the agency head “shall immediately suspend the employment of the person involved if he deems such suspension necessary in the interests of the national security and, following such investigation and review as he deems necessary, the head of the department or agency concerned shall terminate the employment of such suspended officer or employee whenever he shall determine such termination necessary or advisable in the interests of the national security, in accordance with the said act of August 26, 1950.”[14] Id. § 6. As the Supreme Court previously noted, “it is clear from the face of the Executive Order that the President did not intend to override statutory limitations on the dismissal of employees, and promulgated the Order solely as an implementation of the 1950 Act ” i.e., what is now 5 U.S.C. § 7532. Cole v. Young, 351 U.S. 536, 557 n. 20, 76 S.Ct. 861, 100 L.Ed. 1396 (1956) (emphasis added). The “statutory limitations” in question in Cole required review of adverse employment actions with respect to those employees enjoying veterans’ preference rights, and served as the predecessor of the current *1247 Chapter 75 which protects federal civil service employees generally. See Veterans’ Preference Act of 1944, ch. 287, 58 Stat. 387, 390-91.[15] If Executive Order No. 10,450 did not override the earlier limited protections, it can hardly be read to override the later-enacted expanded protections in the current CSRA. Thus, neither Executive Order No. 12,968 nor Executive Order No. 10,450 authorizes agencies to insulate adverse employment actions from Board review where the employees occupy a national security position, outside the context of security clearance revocations or actions under section 7532 — neither of which exists here.
Third, neither Dames nor Youngstown supports agency (as opposed to Presidential) action independent of congressional authorization. An agency cannot administratively create authority for agency action. “Agencies are created by and act pursuant to statutes.” Elgin v. Dep’t of the Treasury, — U.S. —, 132 S.Ct. 2126, 2136 n. 5, 183 L.Ed.2d 1 (2012). An agency may not act “in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.” 5 U.S.C. § 706. Agencies “act[ ] as a delegate to the legislative power,” and “[a]n agency may not finally decide the limits of its statutory power. That is a judicial function.” Social Sec. Bd. v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946). As the Supreme Court noted in Ernst & Ernst v. Hochfelder, even where an agency has been given the authority to fill gaps in the statute, “[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.” 425 U.S. 185, 213-14, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (internal quotation marks omitted); see also Addison v. Holly Hill Fruit Prods., Inc., 322 U.S. 607, 616, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944) (“The determination of the extent of authority given to a delegated agency by Congress is not left for the decision of him in whom authority is vested.”). Where, as here, Congress has not authorized the agency to limit Board review of its decisions, and has indeed revoked such authorization, the agency acts in excess of its statutory authority.
IV
The majority contends that the Supreme Court’s decision in Department of the Navy v. Egan, 484 U.S. 518, 108 S.Ct. 818, supports the exemption of all national security positions from Board jurisdiction over the merits of adverse actions. Majority Op. at 1228-30. However, the Supreme Court itself made clear that Egan’s holding is limited to addressing the “narrow question” of “whether the [Board] has authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action.” Egan, 484 U.S. at 520, 108 S.Ct. 818 (emphasis added). Indeed, every other circuit that has considered Egan has uniformly interpreted it as relating to security clearance determinations.[16] The Egan Court treated *1248 the revocation or denial of a security clearance as a failure to satisfy a job qualification where determinations as to underlying basis for the qualification — whether a security clearance should be granted — had been constitutionally committed to the discretion of another party — the President. See id. at 520, 108 S.Ct. 818 (“[A] condition precedent to Egan’s retention of his employment was ‘satisfactory completion of security and medical reports.’ ”); id. at 522, 108 S.Ct. 818 (“Without a security clearance, respondent was not eligible for the job for which he had been hired.”); see also id. at 527, 108 S.Ct. 818 (“The authority to protect [classified] information falls on the President as head of the Executive Branch and as Commander in Chief.”).
Where an employee fails to satisfy a qualification required for a position and the determination as to whether the employee is eligible for the qualification is committed to the discretion of a third party, it is unsurprising that the Board’s inquiry is limited to whether the job was conditioned on a particular qualification and whether the employee’s qualifying status had been revoked. See id. at 530, 108 S.Ct. 818. In this vein, the Board has held that it lacks authority to evaluate the merits of a decision to revoke an attorney’s bar license, or an employee’s reserve membership, where such license or membership is required for a particular government position. See, e.g., Buriani v. Dep’t of the Air Force, 777 F.2d 674, 677 (Fed.Cir.1985) (holding that the Board should not examine the merits of the Air Force’s decision to remove an employee from reserve membership); McGean v. NLRB, 15 M.S.P.R. 49, 53 (1983) (holding that “the Board is without authority to review the merits” of a decision to suspend an attorney’s membership in the Bar).[17]
Contrary to the majority, Egan turned solely on the President’s constitutional “authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information.” 484 U.S. at 527, 108 S.Ct. 818 (emphasis added). Just as the authority to revoke an attorney’s bar license or a military member’s reserve status lies with an expert third party (the highest court of a state or the military), the authority to protect classified information “falls on the President as head of the Executive Branch and as
*1249 Commander in Chief.” Id. As the Supreme Court noted, Presidents have exercised such authority through a series of Executive Orders. Id. at 528, 108 S.Ct. 818 (citing Executive Orders); see also Exec. Order No. 12,968, 60 Fed. Reg. 40,-245. As noted, those Executive Orders provide that the agency decision to revoke a security clearance shall be “final.” As discussed above, no similar Executive Order purporting to make the agency decision “final” exists here. Contrary to the majority, Egan has been uniformly treated as limited only to limiting review of the underlying merits of the Executive Branch’s decision to revoke or deny a security clearance, and has not been expanded to apply to all conduct that may have the potential to impact national security. See, e.g., Bennett, 425 F.3d at 1002 (“[T]he two determinations [suitability for federal employment and eligibility for security clearance] are subject to different processes of review: whereas suitability determinations are subject to appeals to the Merit Systems Protection Board and subsequent judicial review, security clearance denials are subject to appeal within the agency.” (internal citations omitted)).[18] Egan itself recognized that national security employees can otherwise challenge adverse employment actions before the Board, such that Egan’s “removal ... presumably would be subject to Board review as provided in § 7513.” 484 U.S. at 523 n. 4, 108 S.Ct. 818. In this case, Ms. Conyers and Mr. Northover were not required to have a security clearance in order to hold their respective positions. Thus, Egan is inapplicable.
The majority’s reliance on Carlucci v. Doe, 488 U.S. 93, 109 S.Ct. 407, 102 L.Ed.2d 395 (1988), is also misplaced. Unlike the employees here, the NSA employee in Carlucci had been specifically exempted from the provisions of the CSRA providing for Board review of adverse actions. See id. at 96, 109 S.Ct. 407; see also 10 U.S.C. § 1612(3) (providing that appeals of such adverse actions must take place exclusively within the Department of Defense pursuant to procedures prescribed by the Secretary).
* * *
In summary, Congress’s decision is clear — with the exception of designated agencies such as the CIA, FBI, and intelligence components of the Department of Defense, employees may challenge the merits of adverse actions before the Board. At the same time Congress has provided a safety valve in section 7532, allowing the agencies to summarily remove employees “when, after such investigation and review as [the agency head] considers necessary, he determines that removal is necessary or advisable in the interests of national security.” 5 U.S.C. § 7532(b). It is not the business of the Department of Defense, the Office of Personnel Management, or this court to second-guess the congressional decision to provide Board review. I respectfully dissent.

.Quite apart from the merits, it seems to me that Ms. Conyers's case is moot. The Office of Personnel Management (“OPM”) admits that "no ongoing dispute exists between Ms. Conyers and the Department of Defense.” OPM Br. at 20 n.12. Relying on Horner v. Merit Systems Protection Board, 815 F.2d 668 (Fed.Cir.1987), the majority notes that although the appeal as to Ms. Conyers was dismissed as moot, “OPM ... maintains sufficient interests in this petition to satisfy any Article III case or controversy requirement.” Majority Op. at 1227-28 n.5. I disagree. OPM's only interest in Ms. Conyers's case is in securing an advisory opinion on the requirements of federal law. Nothing is better established than the impermissibility under Article III of rendering such advisory opinions. See Flast v. Cohen, 392 U.S. 83, 96, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("[I]t is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.” (internal quotation marks omitted)).
Homer is readily distinguishable from this case. In Homer, the result of the appeal would have had consequences for the employee, as "the disciplinary action against him [would] be a nullity if [the court] overturned] the board’s decision.” 815 F.2d at 671. In this case, even if the Board is overturned, Ms. Conyers will not be affected because she has already received all relief to which she is entitled based on her suspension. See Cooper v. Dep’t of the Navy, 108 F.3d 324, 326 (Fed. Cir.1997) (“If an appealable action is canceled or rescinded by an agency, any appeal from that action becomes moot.”).

. 5 C.F.R. § 732.201(a) provides, “the head of each agency shall designate, or cause to be designated, any position within the department or agency the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security as a sensitive position at one of three sensitivity levels: Special — Sensitive, Critical — Sensitive, or Noncritical — Sensitive.”

. As OPM recognizes, under the rule adopted by the majority, “[t]he Board's review ... is limited to determining whether [the agency] followed necessary procedures ... [and] the merits of the national security determinations are not subject to review.” OPM Br. at 25; see also Egan, 484 U.S. at 530, 108 S.Ct. 818. "The Board’s review does not ... include the merits of the underlying determination that Mr. North over and Ms. Conyers were not eligible to occupy a sensitive position for national security reasons.” OPM Reply Br. at 15.

. See also Tenenbaum v. Caldera, 45 Fed.Appx. 416, 418 (6th Cir.2002); Ryan v. Reno, 168 F.3d 520, 523-24 (D.C.Cir.1999); Becerra v. Dalton, 94 F.3d 145, 149 (4th Cir.1996); Perez v. FBI, 71 F.3d 513, 514-15 (5th Cir.1995) ("Because the court would have to examine the legitimacy and the possibly pretextual nature of the [agency’s] proffered reasons for revoking the employee's security clearance, any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation decision.” (footnote omitted)).

. The "competitive service" consists of "all civil service positions in the executive branch” with the exception of those positions that are specifically exempted by statute, those positions which are appointed for confirmation by the Senate (unless included by statute), and those positions that are in the Senior Executive Service; other civil service positions that have been "specifically included in the competitive service by statute”; and "positions in the government of the District of Columbia which are specifically included in the competitive service by statute.” 5 U.S.C. § 2102(a). The "excepted service” consists of all “civil service positions which are not in the competitive service or the Senior Executive Service.” Id. § 2103(a).

. The statute defines an "employee” as:
(A)an individual in the competitive service' — •
(i) who is not serving a probationary or trial period under an initial appointment; or
(ii) who has completed 1 year of current continuous service under other than a temporary appointment limited to 1 year or less;
(B) a preference eligible in the excepted service who has completed 1 year of current continuous service in the same or similar positions—
(i) in an Executive agency; or
(ii) in the United States Postal Service or Postal Regulatory Commission; and
(C) an individual in the excepted service (other than a preference eligible)—
(i) who is not serving a probationary or trial period under an initial appointment pending conversion to the competitive service; or
(ii) who has completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less....
5 U.S.C. § 7511(a)(1).

.See Adams v. Dep’t of the Army, 105 M.S.P.R. 50, 55 (2007), aff'd, 273 Fed.Appx. 947 (Fed.Cir.2008) ("[W]hen the charge consists of the employing agency's withdrawal or revocation of its certification or other approval of the employee’s fitness or other qualifications to hold his position, the Board’s authority generally extends to a review of the merits of that withdrawal or revocation.”).

. A "preference eligible” generally includes veterans discharged under honorable conditions, disabled veterans, and certain family members of deceased or disabled veterans. See 5 U.S.C. § 2108(3).

. The 1990 amendment originally excluded inter alia "the National Security Agency [and] the Defense Intelligence Agency” from Chapter 75 of the CSRA. Pub. L. No. 101-376, § 2. *1242 However, in 1996, Congress eliminated this language and replaced it with "an intelligence component of the Department of Defense.” Pub. L. No. 104-201, § 1634(b), 110 Stat. 2422 (1996). The current version of the statute contains this language. See 5 U.S.C. § 7511(b). An “intelligence component of the Department of Defense” includes the NSA, the Defense Intelligence Agency, the National Geospatial-Intelligence Agency, and "[a]ny other component of the Department of Defense that performs intelligence functions and is designated by the Secretary of Defense as an intelligence component of the Department of Defense.” 10 U.S.C. § 1614(2). Neither the Defense Finance and Accounting Service (where Ms. Conyers was employed), nor the Defense Commissary Agency (where Mr. Northover was employed) is an "intelligence component of the Department of Defense.”

. Under section 7532, "the head of an agency may suspend without pay an employee of his agency when he considers that action necessary in the interests of national security.” 5 U.S.C. § 7532(a). "[T]he head of an agency may remove an employee [who has been] suspended ... when, after such investigation and review as he considers necessary, he determines that removal is necessary or advisable in the interests of national security. The determination of the head of the agency is final.” Id. § 7532(b). Although the agency may summarily remove an employee under section 7532, that section also provides for certain procedural protections to an employee before he or she can be removed. See id. § 7532(c).

. The remaining statutory provisions creating the NSPS were ultimately repealed on October 28, 2009. See National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 1113(b), 123 Stat. 2190, 2498 (2009); see also National Security Personnel System, 76 Fed. Reg. 81,359 (Dec. 28, 2011) (repealing regulations implementing the NSPS effective January 1, 2012).

. The provisions of the NSPS concerning collective bargaining were contained in subsection (m) of 5 U.S.C. § 9902, whereas the provisions relating to adverse action appeal rights were contained in subsection (h), and had nothing to do with collective bargaining.

. See Youngstown, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.”).

. The Act of Aug. 26, 1950, Pub. L. No. 81-733, 64 Stat. 476, was the predecessor to 5 U.S.C. § 7532. It provided:
[ Notwithstanding ... the provisions of any other law, [designated agency head] may, in his absolute discretion and when deemed necessary in the interest of national security, suspend, without pay, any civilian officer or employee of the [agency].... The agency head concerned may, following such investigation and review as he deems necessary, terminate the employment of such suspended civilian officer or employee whenever he shall determine such termination necessary or advisable in the interest of the national security of the United States, and such determination by the agency head concerned shall be conclusive and final.

. Prior to enactment of the CSRA in 1978, “only veterans enjoyed a statutory right to appeal adverse personnel action to the Civil Service Commission (CSC), the predecessor of the MSPB.” Fausto, 484 U.S. at 444, 108 S.Ct. 668; see also 5 U.S.C. § 7701 (1976) (“A preference eligible employee ... is entitled to appeal to the Civil Service Commission from an adverse decision ... of an administrative authority so acting.”).

. See, e.g., Rattigan v. Holder, 689 F.3d 764, 768 (D.C.Cir.2012) ("Egan’s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel...."); Zeinali v. Raytheon Co., 636 F.3d 544, 549-50 (9th Cir.2011) ("The core holding[] of Egan ... [is] that federal courts may not review the merits of the executive's decision to grant or deny a security clearance.”); Makky v. Chertoff, 541 *1248 F.3d 205, 213 (3d Cir.2008) ("[Courts] have jurisdiction to review [claims that] do[] not necessarily require consideration of the merits of a security clearance decision.”); Duane v. U.S. Dep’t of Defense, 275 F.3d 988, 993 (10th Cir.2002) (“Egan held that the Navy’s substantive decision to revoke or deny a security clearance-along with the factual findings made by the AJ in reaching that decision-was not subject to review on its merits by the Merit Systems Protection Board.”).

. See Williams v. U.S. Postal Serv., 35 M.S.P.R. 581, 589 (1987) ("[T]he Board’s refusal to examine reasons for bar decertification where the employee is removed for failure to maintain bar membership is firmly grounded in its refusal to collaterally attack the decision of another tribunal, statutorily charged with the authority to render the decision under review.... The Board also affords discretion to the military on matters peculiarly within its expertise because '[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian’ and it is not within the role of the judiciary to intervene in the orderly execution of military affairs.” (quoting Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953))); see also Christofili v. Dep’t of the Army, 81 M.S.P.R. 384, 392 (1999) ("It is well-settled that the regulation of the practice of law and the discipline of members of a state bar is exclusively a state court matter.”); Egan v. Dep't of the Navy, 28 M.S.P.R. 509, 518 (1985) ("In all these contexts, the underlying actions, i.e., termination of reserve status ... and bar decertification, are committed to appropriate procedures within the respective entities.... ”).

. See also, e.g., Jacobs v. Dep't of the Army, 62 M.S.P.R. 688, 695 (1994) ("The Supreme Court's decision in Egan was narrow in scope and specifically applied only to security clearance revocations.”); Cosby v. Fed. Aviation Admin., 30 M.S.P.R. 16, 18 (1986) ("Egan addresses only those adverse actions which are based substantially on an agency’s revocation or denial of an employee's security clearance.”).