**Jack LOWE and Dennis Reynolds, Plaintiffs,**

**v.**

**ATLAS LOGISTICS GROUP RETAIL SERVICES (ATLANTA), LLC, Defendant.**

**Civil Action No. 1:13–CV–2425–AT.**

United States District Court, N.D. Georgia, Atlanta Division.

Signed May 5, 2015.

Amanda A. Farahany, Benjamin F. Barrett, Jr., Benjamin Andrew Stark, Barrett & Farahany, LLP, Atlanta, GA, for Plaintiffs.

Alison Elena Loy, Dion Y. Kohler, Jackson Lewis, P.C., Atlanta, GA, for Defendant.

### ORDER.

AMY TOTENBERG, District Judge. .

Atlas Logistics Group Retail Services (Atlanta), LLC ("Atlas") operates warehouses for the storage of products sold at a variety of grocery stores. So one could imagine Atlas's frustration when a mystery employee began habitually defecating in one of its warehouses.[1] To solve the mystery of the devious defecator, Atlas requested some of its employees, including Jack Lowe and Dennis Reynolds, to submit to a cheek swab. The cheek cell samples were then sent to a lab where a technician compared the cheek cell DNA to DNA from the offending fecal matter. Lowe and Dennis were not a match. With the culprit apparently still on the loose, Lowe and Dennis filed suit under the Genetic Information Nondiscrimination Act ("GINA"), 42 U.S.C. § 2000ff et seq., which generally prohibits employers from requesting genetic information from its employees.

The matter is before the Court on the parties' Cross–Motions for Summary Judgment [Docs. 44, 45]. The legal question before the Court is whether the information requested and obtained by Atlas was "genetic information" covered by GINA. For the reasons that follow, the Court concludes that it is. Thus, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment.

#### I. LEGAL STANDARD

The Court may grant summary judgment only if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

---

1. Apparently, this problem is not as rare as one might imagine. *See* Ashtari, *EPA Employees Asked To Stop Pooping In The Hall-* *way,* Huffington Post (June 26, 2014 10:59 AM).

56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter

of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1331 (11th Cir.2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir.1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## II. FACTUAL BACKGROUND

Atlas provides long-haul transportation and storage services for the grocery industry. (Pl.'s Resp. Def.'s Statement of Undisputed Material Facts No. 1 ("Pl's Resp. SMF"), Doc. 53–1.)[2] As part of its services, Atlas maintains warehouse facilities to store grocery items which are then distributed to grocery retailers. (*Id.* No. 2.) Beginning in 2012, an unknown number of Atlas employees began defecating in Atlas's Bouldercrest Warehouse. (*Id.* No. 6.) The defecations occurred numerous times and necessitated the destruction of grocery products on at least one occasion. (*Id.* No. 6–7.)

Atlas attempted to remedy the defecation issue by asking its Loss Prevention Manager, Don Hill, to conduct an investigation. (*Id.* No. 8.) Mr. Hill began his investigation by comparing employee work schedules to the timing and location of the defecation episodes in order to create a list

---

**2.** Many of the material facts are not in dispute. The Court cites Plaintiffs' Response to Defendant's Statement of Undisputed Materi-

al Facts to extent Plaintiff admits the fact asserted. Otherwise, the Court cites to evidence in the record.

of employees who may have been responsible. (*Id.* No. 8–10.) Plaintiffs Jack Lowe and Dennis Reynolds were two of the employees Mr. Hill identified. (Pl.'s Statement of Undisputed Material Facts ("SMF") Ex. D ("Investigative Narrative") at 4, Doc. 44-6.)

Once Mr. Hill created the list of potential suspects, he hired Speckin Forensic Labratories ("Speckin Labs") to assist in the investigation. (Pl's Resp. SMF No. 12.). Hill retained Speckin Labs to perform a comparison of buccal swab samples[3] to the fecal matter collected in the Warehouse. (*Id.* No. 13.) Atlas requested that the results of the comparison be transmitted to Atlas. (*See* Investigative Narrative at 4–6.)

In order to perform the comparison, Speckin Labs suggested using Short Tandem Repeat analysis ("STR analysis"). (Pl's Resp. SMF No. 15.) STR analysis compares samples by analyzing "genetic spacers" at various sites. (*Id.* No. 16.) "Genetic spacers" are the space between an individual's genes and vary drastically from person to person. (*Id.* No. 17.) STR analysis can be used to compare DNA from one sample to another for identification purposes. (*Id.* No. 20.) STR analysis cannot, however, determine an individual's propensity for disease or disorder. (*Id.* No. 19.)

Speckin Labs sent Dr. Julie Howenstine to the Warehouse in October 2012 to collect buccal swab samples from Lowe and Reynolds. (*Id.* No. 21.) Lowe and Reynolds provided[4] samples to Dr. Howenstine, who then sent the samples to GenQuest DNA Analysis Laboratory ("GenQuest") via an intermediary, Semen and Sperm Detection, Inc. (*Id.* No. 23–25, 36.) Dr. Howenstine requested that GenQuest use the PowerPlex 21 System ("PowerPlex 21") to perform the STR analysis of Lowe's and Reynolds's buccal swab samples. (*Id.* No. 35.) The PowerPlex 21 measures the length of spaces between two genes at twenty chromosome spaces to compare various DNA samples. (*Id.* No. 38.) The PowerPlex 21 produces an electropherogram, which graphs the PowerPlex 21's analysis of DNA samples. (*See id.* No. 42.)

After performing the PowerPlex 21 analysis on Lowe's and Reynolds's DNA samples, GenQuest sent Dr. Howenstine the electropherogram with the PowerPlex 21 analysis' findings. (*Id.* No. 42.) Using the data provided in the electropherogram, Dr. Howenstine compared the DNA samples of Lowe and Reynolds to the DNA of the fecal matter and determined that neither Lowe nor Reynolds were the culprits. (*Id.* No. 42–45.) Dr. Howenstine documented this mismatch in a letter to Mr. Hill on October 22, 2012. (*Id.* No. 46.)

On March 27, 2013, Lowe and Reynolds filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The Plaintiffs alleged that Atlas violated the Genetic Information Nondiscrimination Act, 42 U.S.C. § 2000ff et seq. ("GINA") because Atlas illegally requested and required them to provide their genetic information and illegally disclosed their genetic information. The EEOC dismissed Lowe's and Reynolds's charges against Atlas on April 24, 2013.

---

3. Buccal swab samples are DNA samples obtained by rubbing a cotton swab on the inside of the cheek. (Deposition of Dr. Julie Howenstine ("Howenstine Deposition") at 15–16, Doc. 45-10.)

4. The parties dispute whether Lowe and Reynolds provided the sample voluntarily or were coerced into providing the samples. This dispute, however, is not material. The Court's decision turns on whether Atlas requested genetic information, not whether Lowe and Reynolds voluntarily gave a DNA sample.

Specifically, the Dismissal and Notice of Rights letters stated:

> The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised in this charge.

(Dismissal and Notice of Rights of Dennis Reynolds ("Reynolds Notice"); Doc. 45–18; Dismissal and Notice of Rights of Jack Lowe ("Lowe Notice"), Doc. 45–19.) The letters entitled Lowe and Reynolds to file suit within 90 days of April 24, 2013. On July 22, 2013, Lowe and Reynolds timely filed this action.

### III. ANALYSIS

According to Plaintiffs Jack Lowe and Dennis Reynolds, the undisputed facts show that Atlas requested information about Speckin Labs's comparison of Lowe's and Reynolds's DNA to the fecal sample. These facts, Plaintiffs argue, demonstrate that Atlas violated 42 U.S.C. § 2000ff–1(b), which makes it "an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee."[5] Plaintiffs therefore move for Partial Summary Judgment as to Atlas's liability under this section of GINA.

Atlas responds and argues in its Motion for Summary Judgment that the information the company requested concerning Lowe's and Reynolds's DNA analysis does not constitute "genetic information" as defined in GINA. According to Defendant's interpretation of GINA, "genetic information" refers only to information related to an individual's propensity for disease. For this reason, Defendant moves for summary judgment as to all of Plaintiffs' claims. The issue before the Court, therefore, is whether the term "genetic information" as used in GINA encompasses the information Atlas requested in this case.

"As with any question of statutory interpretation, [the Court] begin[s] by examining the text of the statute to determine whether its meaning is clear." *Lindley v. F.D.I.C.*, 733 F.3d 1043, 1055 (11th Cir. 2013) (citing *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir.2002)). The Court's analysis stops at a review of the text of GINA "if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Med. Transp. Mgmt. Corp. v. Comm'r of IRS*, 506 F.3d 1364, 1368 (11th Cir.2007). If the statutory language may be reasonably interpreted in more than one way, however, the statutory language is deemed ambiguous and additional tools of statutory interpretation should be used. *Id.* Only "in rare and exceptional circumstances" may a court "decline to follow the plain meaning of a statute because overwhelming extrinsic evidence demonstrates a legislative intent contrary to the text's plain meaning." *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 238 (11th Cir.1995).

As discussed below, the Court determines that the unambiguous language of GINA covers Atlas's requests for Lowe's and Reynolds's genetic information and thus compels judgment in favor of Lowe and Reynolds. This case is not one of the rare instances where overwhelming extrinsic evidence demonstrates a legislative intent contrary to the text's plain meaning. For these reasons, the Court grants Plaintiffs' Motion for Partial Summary Judgment and denies Defendant's Motion for Summary Judgment.

---

**5.** Plaintiffs state in their Motion for Partial Summary Judgment that they withdraw their claims as to disclosure of Lowe's and Reynolds's DNA under 42 U.S.C. § 2000ff–5(b).

## A. The Unambiguous Statutory Language of GINA

■ The Court begins its analysis with the language of GINA. GINA makes it "an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee." 42 U.S.C. § 2000ff–1(b). Section 2000ff–1(b) lists six exceptions to this general prohibition, but Atlas admits that none of the statutory exceptions apply here. (Def. Resp. to Pls.'s First Set of Reqs. for Admis. 5, Doc. 44–3.) The parties also agree that Atlas is an "employer" and Lowe and Reynolds are "employees" as defined by GINA. (Def.'s Resp. SMF at 1–2,) 42 U.S.C. § 2000ff(2)(A)-(B). The parties' disagreement centers on a single phrase in Section 2000ff–1(b): "genetic information."

GINA defines genetic information as "with respect to any individual, information about (i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff(4). Parts (ii) and (iii) do not apply to Lowe and Reynolds's claims, as the PowerPlex 21 analysis was not performed on DNA of their family members. Therefore, the DNA analysis would only qualify as "genetic information" under GINA if the analysis qualifies as a "genetic test."

"Genetic test" is also defined in GINA. The statute defines "genetic test" as "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, that detects genotypes, mutations, or chromosomal changes." 42 U.S.C. § 2000ff(7). The extent of GINA's guidance ends with its definition of "genetic test:" none of the words included in 42 U.S.C. § 2000ff(7) are further defined in GINA.

If all the Court considers is the language of GINA, the undisputed evidence in the record establishes that the DNA analysis at issue here clearly falls within the definition of "genetic test." The parties agree that Dr. Howenstine conducted an "analysis" of Lowe's and Reynolds's DNA. (Def.'s Resp. SMF at 10.) And the undisputed evidence in the record shows that this analysis at a minimum detects genotypes and mutations.[6] Because the parties agree that Atlas requested a comparison of Lowe's and Reynolds's DNA to the fecal DNA found in the warehouse, Atlas's request and course of action appear to constitute a violation of 42 U.S.C. § 2000ff–1(b)'s prohibition against requesting genetic information from employees.

Defendant argues that this straightforward but broad interpretation of GINA is erroneous. Defendant urges the Court to interpret the "genetic test" language of GINA to exclude analyses of DNA, RNA, chromosomes, proteins, or metabolites if

---

**6.** Atlas seems to dispute whether the analysis "detects genotypes [and] mutations." However, Dr. Howenstine, Defendant's own expert, acknowledged that the analysis performed on Lowe's and Reynolds's DNA detects both mutations and genotypes. (Howenstine Dep. 85:24–86:11, 88:5–8; Howenstine Ex. Report 2, Doc. 45–11 (acknowledging that the PowerPlex21 test detects genotypes, *which consists entirely of DNA that does not manifest itself by producing any RNA or protein as a gene does*") (emphasis added); *see also* Expert Report of Dr. Barbara Llewellyn at 2, Doc. 44–11 ("[T]he *DNA analysis* ... included typing *genotypes* at 21 different locations (loci) on the DNA molecule for each reference sample ..." (emphasis added))). Likewise, as Atlas acknowledges, "Howenstine testified that PowerPlex 21 *has the potential to detect one mutation* regarding the number of fragments in a given location ..." (Def.'s Resp. SMF at 13 (emphasis added).) Thus, if this mutation is present, the PowerPlex 21 analysis detects it.

such analyses do not reveal an individual's propensity for disease. This proposed definition of "genetic tests"—a definition which limits genetic tests to those related to one's propensity for disease—renders other language in GINA superfluous, and should thus be rejected. *See United States v. Alabama*, 778 F.3d 926 (11th Cir.2015) ("[W]hen [courts] engage in statutory interpretation, '[i]t is our duty to give effect, if possible, to every clause and word of a clause.'") (citing *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)).

Section 2000ff–1(b) makes it unlawful to request, require, or purchase genetic information, except in six contexts. Section 1(b)(6), in turn, expressly allows employers to request, require, or purchase some genetic information which has nothing to do with the propensity for disease. 42 U.S.C. § 2000ff–1(b)(6). Specifically, an employer is not liable under GINA where it conducts a "DNA analysis ... for purposes of human remains identification, and requests or requires genetic information of such employer's employees, but only to the extent that such genetic information is used for analysis of DNA identification markers for quality control to detect sample contamination." 42 U.S.C. § 2000ff–

1(b)(6). This exception would be unnecessary if Atlas's construction of GINA were correct, because under Atlas's construction, the term "genetic information" already excludes DNA analyses for purposes of human remains identification—a type of analysis unrelated to testing for disease propensity.[7] Thus, the exception in § 2000ff–1(b)(6) weighs against Atlas's interpretation. *See also Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1345 (11th Cir.2014) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (citing *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–617, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980)).

Atlas's reliance on GINA's legislative history to argue otherwise is unpersuasive. According to Atlas, this human remains identification exception was created to address a concern raised by the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). (Def.'s Reply at 7–8, Doc. 57 (citing H.R.Rep. No. 110–28, pt. 3, *68 (2007)).) drafting of GINA, ATF expressed its concern that its DNA profile index, developed for forensic purposes, seemed to violate GINA as drafted.[8] *Id.* And Congress ap-

---

7. The EEOC has articulated a similar point. In an Informal Discussion Letter, the EEOC responded to a question asking whether this sixth exception of GINA applies to manufacturers of supplies used in forensic DNA analysis. *See* EEOC Informal Discussion Letter (June 6, 2012), http: //www.eeoc.gov/eeoc/foia/letters/2012/gina_forensic_lab_exception.html. The employer who asked for the EEOC's approval sought to require employees to provide genetic information without violating GINA. *Id.* After consultation with experts at the National Human Genome Research Institute, the EEOC wrote that "forensic DNA analysis constitutes a genetic test." *Id.* The EEOC explained that "the fact that Congress included an exception specifically permitting forensic DNA analysis suggests that it constitutes genetic testing that would be prohibited

in the absence of the exception." *Id.* The EEOC ultimately declined taking a position on the question, stating that the question "was not raised during the public comment period ... nor is there any legislative history to indicate that it was contemplated." *Id.*

8. ATF explained that DNA technology has advanced to a stage where DNA profiles can be obtained by handling objects or leaving a fingerprint. H.R.Rep. No. 110–28, pt. 3, *68 (2007). Many forensic DNA labs maintain an employee DNA index and compare all DNA profiles developed from evidence to the employee DNA index. *Id.* This comparison achieves two ends. First, the comparison prevents false exclusions by identifying and eliminating DNA profiles which belong to an employee instead of a true perpetrator. *Id.*

parently carved out the narrow exception for law enforcement agencies in response to ATF's concerns. But Atlas does not explain why such an exception would be necessary if, as Atlas would have it, the definition of "genetic information" already excludes the type of information in ATF's index—genetic information unrelated to one's propensity for disease.[9] The Court therefore rejects Atlas's interpretation, which is inconsistent with the plain terms of the statute.

### B. Evidence of Legislative Intent

■ Despite the plain, unambiguous language of GINA providing a broad definition of "genetic information," which covers the information Atlas requested in this case, Atlas urges the Court to adopt its narrow definition. It is true that "in rare and exceptional circumstances [a court] may decline to follow the plain meaning of a statute because overwhelming extrinsic evidence demonstrates a legislative intent contrary to the text's plain meaning." *Boca Ciega Hotel, Inc.*, 51 F.3d at 238. This is not such an exceptional case.

Atlas first relies on the Congressional Findings, included in GINA, to urge the Court to adopt its definition of "genetic information," but the Congressional Findings lend Atlas only limited support. The Congressional Findings do indeed express a concern that advances in genetic testing, which "can allow individuals to take steps to reduce the likelihood that they will con-

tract a particular disorder," also "give rise to the potential misuse of genetic information to discriminate in health insurance and employment." 42 U.S.C. § 2000ff note. And as Atlas highlights, the Findings include historical examples of discrimination on the basis of genetic testing that reveals the existence of or propensity for disease, such as state-sanctioned sterilization of individuals with genetic defects and state-sanctioned sickle cell anemia testing. *Id.* But Atlas ignores the Findings' more general pronouncement of GINA's purpose: to "establish[ ] a national and uniform basic standard" of unacceptable use of genetic information in health insurance and employment, in order "to fully protect the public from discrimination and allay their concerns about the potential for discrimination, thereby allowing individuals to take advantage of genetic testing, technologies, research, and new therapies." *Id.* It is not unreasonable for Congress to achieve this "national and uniform basic standard" of full protection by broadly prohibiting employers from requesting, requiring, or purchasing genetic information of their employees, except under limited circumstances. On the contrary, GINA's statutory regime, which errs on the side of prohibiting employer-mandated or requested genetic testing, seems fully consistent with these Congressional Findings.

Atlas next cherry-picks statements made during the legislative process to support its proposition that the term "genetic test"

---

Second, if a DNA profile developed from evidence is not identified, that profile is then uploaded to the Combined DNA Index System ("CODIS"). *Id.* By identifying the DNA profile as one which belongs to a lab employee, the employee DNA index prevents both inadvertent uploads and subsequent linking of unlinked crimes. *Id.* By maintaining the staff index, ATF prevents both false exclusions accidentally created by an investigator or laboratory personnel and ATF employees' DNA information from being uploaded to the Combined DNA Index System. *Id.*

**9.** Professor David H. Kaye suggests that this law enforcement exception may still have been necessary to the extent an analysis for purposes of human remains identification may also "have (or will turn out to have) medical diagnostic or predictive value." David H. Kaye, *Gina's Genotypes*, 108 Mich. L.Rev. First Impressions 51, 55–56 (2015), http://repository.law.umich.edu/mlr_fi/vol108/iss1/5. Perhaps. But Atlas offers no legislative history to support that this was in fact Congress's concern.

was meant to encompass a narrower set of tests which detect one's propensity for disease. For example, Representative Louise Slaughter, sponsor of the original GINA bill in the House of Representatives identified examples of genetic tests including tests conducted on Hasidic Jewish children to determine if they had diseases, tests that could be "life-saving," and tests that determine whether one has sickle cell anemia. 110 Cong. Rec. E120 (daily ed. Jan. 16, 2007) (remarks of Rep. Slaughter). Atlas notes that these examples involve one's propensity to develop disease. But Representative Slaughter did not indicate that these examples were exhaustive. In any case, one legislator's list of examples—offered a year and half before the bill's final passage, and before numerous debates and amendments to the statute—provides little insight into the overall congressional purpose of the Act.

Atlas then erroneously cites the view of a handful of legislators that the intent of GINA was to be limited to combating discrimination based on one's propensity for disease. (Def.'s Reply at 8–9, Doc. 57.) As Atlas points out, this group of eleven legislators "believe[d] that the basic intent of the authors [of the bill] [was] to regulate a predictive assessment concerning an individual's propensity to get an inheritable genetic disease or disorder based on the occurrence of an inheritable genetic disease or disorder in the family member." H.R.Rep. No. 110–28, pt. 3, at 70 (Mar. 29, 2007). But the legislators recognized that,

as written, GINA's scope was much broader. They referenced the Director of the Human Genome Project Dr. Francis Collins's testimony that "the GINA reference to detecting a genotype covered, among other things, ... forensic DNA identification tests, tissue typing for organ donation[,] and paternity tests," all tests that do not indicate one's propensity for disease. *Id.* at 71 (citing Collins's testimony). This small group of legislators expressed concern about GINA's "failure to limit [the] definition [of genetic information] to genetic markers for genetic disease." *Id.* They therefore urged a narrowing of the scope of the statute. Despite these concerns, Congress stuck with the broad definition of "genetic tests" in the final version of the bill.[10] Accordingly, the view of this small group of legislators appears to have been rejected. *See also, e.g.; Steinle v. Boeing Co.,* 785 F.Supp. 1434, 1439 (D.Kan.1992) ("Courts should carefully scrutinize whether the legislative history evidences Congress' intent or is merely the expression of one person's personal viewpoint injected into the record in an effort to sway the courts in a manner that person was unable to persuade the legislature.").

Moreover, to address concerns about GINA's broad definition of "genetic information," the FBI suggested a narrow definition of genetic test limited to "the analysis of human DNA, RNA, chromosomes, proteins, or certain metabolites in order to detect disease-related genotypes or related phenotypes." *Id.* at 68.[11] With this nar-

---

**10.** In fact, Atlas concedes that Congress left "GINA's broad definition in place." (Def.'s Reply at 9, Doc. 57.) Atlas argues, however, that Congress "delegate[d] the difficult task of interpreting and enforcing the statute to someone with more expertise," i.e. the EEOC. (*Id.*) And according to Atlas, the EEOC took the initiative to narrow the scope of the statute by providing examples that do not extend beyond genetic tests for propensity for disease. The Court addresses and rejects the assertion that the EEOC has limited the defi-

nition of genetic information below in Part III.C.

**11.** The FBI's suggested definition of "genetic test" in its entirety is as follows: "The term 'genetic test' means—the analysis of human DNA, RNA, chromosomes, proteins, or certain metabolites in order to detect disease-related genotypes or related phenotypes. The term does not apply to any such testing which is conducted for the exclusive purposes of identification, where no information regard-

row definition, the FBI recommended striking the exceptions. *Id.* at 68. The FBI's proposal, however, did not make its way into the final bill.

The Congressional Findings and legislative history Atlas relies upon are not remotely sufficient to justify departing from the plain meaning of the statute's text. Accordingly, the Court applies the plain terms of the statute to find that, based on this record, Atlas violated GINA when it requested the results of the PowerPlex 21 test.

## C. EEOC Regulation

█ As the Court concludes that the statute unambiguously covers the conduct at issue in this case, its analysis is complete. Nonetheless, because so few courts have had the occasion to address GINA, the Court briefly addresses Atlas's argument that an EEOC regulation, promulgated under GINA in accordance with 42 U.S.C. § 2000ff–10, weighs in favor its interpretation. Atlas argues, "Assuming, *arguendo,* that GINA's definition of 'genetic information' or 'genetic tests' is ambiguous, the Court should defer to the EEOC's interpretation of GINA as set forth in its regulations, which supports an order for summary judgment in Defendant's favor." (Def.'s Br. Supp. Mot. Summ. J. at 14–15, Doc. 45–1 (citing *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).)

Although the EEOC's regulation define "genetic test" with exactly the same language as the statute,[12] the regulation provide a list of examples, and Atlas attempts to capitalize on this list to support its argument. According to the regulation,

"[g]enetic tests include, but are not limited to" the following:

(i) A test to determine whether someone has the BRCA1 or BRCA2 variant evidencing a predisposition to breast cancer, a test to determine whether someone has a genetic variant associated with hereditary nonpolyposis colon cancer, and a test for a genetic variant for Huntington's Disease;

(ii) Carrier screening for adults using genetic analysis to determine the risk of conditions such as cystic fibrosis, sickle cell anemia, spinal muscular atrophy, or fragile X syndrome in future offspring;

(iii) Amniocentesis and other evaluations used to determine the presence of genetic abnormalities in a fetus during pregnancy;

(iv) Newborn screening analysis that uses DNA, RNA, protein, or metabolite analysis to detect or indicate genotypes, mutations, or chromosomal changes, such as a test for PKU performed so that treatment can begin before a disease manifests;

(v) Preimplantation genetic diagnosis performed on embryos created using invitro fertilization;

(vi) Pharmacogenetic tests that detect genotypes, mutations, or chromosomal changes that indicate how an individual will react to a drug or a particular dosage of a drug;

(vii) DNA testing to detect genetic markers that are associated with information about ancestry; and

(viii) DNA testing that reveals family relationships, such as paternity.

---

ing the sample is to be provided to any entity for the purposes of determining any health related information regarding either the individual or members of the individual's family." H.R. Rep. 110–28, pt. 3, at *68.

**12.** *Compare* 42 U.S.C. § 2000ff(7) (defining genetic test as "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detects genotypes, mutations, or chromosomal changes"), *with* 29 C.F.R. § 1635.3(f)(1)-(2) (2010) (same).

29 C.F.R. § 1635.3(f)(1)-(2) (2010). Atlas correctly points out that tests like the PowerPlex 21 analysis are absent from the list of "genetic tests" identified by the EEOC. Thus, according to Atlas, the PowerPlex21 is not the type of test contemplated by the term "genetic test."

The Court rejects Atlas's argument for three reasons. First, as noted in the regulation, this list is not meant to be exhaustive. Thus, PowerPlex 21's absence from the list is not, in itself, instructive. Second, two of the examples in the EEOC Regulation, "DNA testing to detect genetic markers that are associated with information about ancestry" and "DNA testing that reveals family relationships, such as paternity," do not determine an individual's propensity for disease. If the Court were to apply Atlas's narrow definition of "genetic tests," these two examples would go beyond the scope of the statute. Finally, the EEOC regulations identify tests and procedures which are *not* genetic tests under GINA. *See* 29 C.F.R. § 1635.3(f)(3). None of those tests resemble the PowerPlex 21 analysis or support Defendant's argument.[13] For these reasons, the Court is unpersuaded that the EEOC's list of examples weighs in favor of Atlas's interpretation.

The Court finds Atlas's remaining arguments unpersuasive.[14] The plain language of the statute provides that employers may not "request ... genetic information with respect to an employee." 42 U.S.C. § 2000ff–1(b). And as GINA broadly defines it, "genetic information" includes information about an individual's "genetic tests," such as the PowerPlex 21 test of Lowe's and Reynolds's DNA here. Thus, Atlas's request for the PowerPlex 21 results is a violation of GINA.

## IV. CONCLUSION

For the reasons discussed above, the Court finds Atlas liable under 42 U.S.C. § 2000ff and **GRANTS** Plaintiffs Jack Lowe and Dennis Reynolds Partial Motion for Summary Judgment [Doc. 44] as to liability. The Court **DENIES** Defendant Atlas Logistics Group Retail Services (At-

13. According to Atlas, the Supplementary Information to the Regulations explicitly provides that "genetic tests" are only those used to "detect gene variants associated with a specific disease or condition." Regulations Under the Genetic Information Nondiscrimination Act of 2008, 75 Fed.Reg. 68,912, at 68,916 (Nov. 9, 2010). However, the term "only" does not appear in this section of the Supplementary Information. Atlas also erroneously states that the EEOC "has already determined that no violation of GINA occurred," referring to the EEOC's "Dismissal and Notice of Rights" letters sent to Lowe and Reyolds. (Atlas's Br. Supp. Mot. Summ. J. at 18, Doc. 45–1; *see* Doc. 45–18 and 45–19.) On the contrary, the EEOC found that it was "unable to conclude that the information obtained establishes violations of the statute." (Doc. 45–18 at 1.) And the box checked on both Lowe's and Reynolds's Notice states that the document "does not certify that the respondent is in compliance with the statutes." (*Id.*) In any case, the Court is " 'not required

to defer or make reference to the EEOC determination' in its opinion deciding summary judgment." *Keaton v. Cobb Cnty.*, 545 F.Supp.2d 1275, 1310 (N.D.Ga.2008) (citing *Kincaid v. Bd. of Trs.*, 188 Fed.Appx. 810, 817 (11th Cir.2006)), *aff'd sub nom. Keaton v. Cobb Cnty., GA*, No. 08–11220, 2009 WL 212097 (11th Cir. Jan. 30, 2009).

14. Atlas also relies on two cases to support its position. Neither case is helpful to this Court's analysis. *See Bell v. PSS World*, No. 3:12–cv–381–J–99MMH–JRK, 2012 WL 6761660 (M.D.Fla. Dec. 7, 2012) (dismissing GINA claim in which Plaintiff alleged that information about hyperthyroidism was "genetic information"), *report and recommendation adopted by* 2013 WL 45826 (Jan. 3, 2013); *Poore v. Peterbilt of Bristol, L.L.C.*, 852 F.Supp.2d 727, 730 (W.D.Va.2012) (dismissing GINA claim because Plaintiff's wife's multiple sclerosis did not qualify as "genetic information with respect to the employee" under 42 U.S.C. § 2000ff–1).

lanta), LLC Motion for Summary Judgment [Doc. 45] as to all claims.

The parties are **DIRECTED** to file a consolidated proposed pretrial order on or before May 20, 2015. Plaintiffs **SHALL** address in their proposed pretrial order whether they intend to rely on the expert opinion of Professor Paul A. Lombardo to support their damages claims, and if so, what authority they rely on for the use of an expert to provide analysis of the legislative history and purpose of a statute at issue. If necessary, Defendant shall address any objections to Plaintiffs' use of Professor Lombardo's testimony.

All motions in limine are due on or before May 22, 2015. Responses to motions in limine are due on or before May 28, 2015. The Court will hold a pretrial conference on June 2, 2015 at 2:30 PM in Courtroom 2308 of the Richard B. Russell Federal Courthouse, 75 Spring Street, SW, 30303–3309. The trial on damages in this case will commence with jury selection at 9:30 AM on June 8, 2015.

**IT IS SO ORDERED.**